**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
JOHN J. CURCIO, Ph.D.,

                        Plaintiff,

        - against -

ROOSEVELT UNION FREE SCHOOL DISTRICT,
THE BOARD OF EDUCATION OF THE
ROOSEVELT UNION FREE SCHOOL DISTRICT
and WILHELMINA FUNDERBURKE, individually
and as a member of the BOARD OF EDUCATION
OF THE ROOSEVELT UNION FREE SCHOOL
DISTRICT,

                       Defendants.
------------------------------------------------------------------X

                 **MEMORANDUM**
                  **AND ORDER**

             CV 10-5612 (SJF) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.      P<small>RELIMINARY</small> S<small>TATEMENT</small>

    John J. Curcio ("Plaintiff" or "Dr. Curcio") is a former Assistant Superintendent of

Human Resources for the Roosevelt Union Free School District (the "District). In this civil

rights/employment litigation, Dr. Curcio asserts that he has been the victim of racial

discrimination and retaliation by the Defendants based on the fact that he is Caucasian. Presently

before the Court are two motions by Dr. Curcio seeking evidentiary and monetary sanctions

against the District, the Board of Education of the Roosevelt Union Free School District (the

"Board") and Board member Wilhelmina Funderburke ("Funderburke") for the spoliation and

non-production of evidence purportedly reflecting racially motivated and retaliatory actions taken

against Dr. Curcio by the Defendants during his employment with the District. In particular, Dr.

Curcio requests that an adverse inference instruction be given at trial and that Defendants be ordered to pay Plaintiff reasonable attorneys' fees and costs associated with his efforts to both obtain Defendants' compliance with their discovery obligations and to uncover Defendants' destruction of key evidence. He also seeks the fees and costs incurred in making the present motions.

Plaintiff's first motion seeks spoliation sanctions solely against Wilhelmina Funderburke for her alleged failure to preserve relevant notes she took during the period at issue in this lawsuit. Plaintiff's second motion, brought against the District and the Board (hereafter, "the Roosevelt Defendants"), seeks sanctions based on their alleged failure to preserve and produce relevant documents, audiotapes and videotapes. For the reasons set forth below, Plaintiff's motion against Defendant Funderburke is GRANTED in part, and DENIED in part, and Plaintiff's motion against the Roosevelt Defendants is DENIED.

## II.  BACKGROUND

Dr. Curcio commenced this action by filing a Complaint on December 3, 2010. DE 1. He subsequently filed an Amended Complaint on July 15, 2011. DE 27. The Plaintiff brings this action against the Defendants for violations of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e, *et seq*., as well as other rights secured by 42 U.S.C. §§ 1983, 1985, 1986 and Article 15 of the New York State Executive Law § 296. Dr. Curcio was hired by the Defendants as an Assistant Superintendent of Human Resources in July 2008. Am. Compl. ¶ 11. The Plaintiff alleges that Defendant Funderburke, an African-American woman who is a member of the Board, engaged in a course of hostile conduct toward him, repeatedly making negative and

adverse comments about his being Caucasian and of white color at both Board meetings and in the workplace. *Id.* ¶¶ 18-19. It is the Plaintiff's contention that such racially motivated comments and outbursts were made by Funderburke at various times from September 2008 through January 21, 2010. *Id.* ¶ 20. As for the Defendant Board, the Plaintiff alleges that it also exhibited racially motivated and retaliatory actions against him by (1) refusing to make his compensation comparable to African-American administrators employed in the District, (2) providing a derogatory and untrue employee evaluation, and (3) denying him tenure. *Id.* ¶¶ 50-54. For these and other reasons, the Plaintiff maintains that he was discriminated against by the Defendants on the basis of his race and color, was subjected to a hostile work environment and was retaliated against for commencing litigation to address the discrimination.

On March 29, 2011, Judge Feuerstein referred all discovery to the undersigned. DE 18. In response to Judge Feuerstein's Order, this Court scheduled a conference for May 27, 2011 in order to implement a discovery plan. After meeting with the parties on May 27, 2011, the Court entered a Case Management and Scheduling Order ("CMSO") which set various deadlines, including a September 2, 2011 deadline for the completion of discovery.[1] *See* DE 22. Plaintiff served his first set of document requests on the Defendants on July 14, 2011.[2] *See* Maurizio

---

[1]     The parties were advised at this conference and in the Minute Order entered at the conclusion of the conference that "in light of Judge Feuerstein having set her pre-trial conference for October 19, 2011, all dates in the discovery plan must be backed out from that date." DE 21. The parties were also advised on May 27 that the dates in the CMSO could not be adjourned. *Id.* At a subsequent conference on August 4, 2011, counsel were again reminded that the September 2, 2011, discovery deadline remained in effect and would not be extended. *Se* DE 29.

[2]     Although the Court was not provided with the demands served on Defendant Funderburke, there is a representation by Plaintiff's counsel that those demands were also served on July 14, 2011. The Court notes that Plaintiff served his first set of discovery demands on the Defendants almost one month beyond the deadline set forth in the CMSO. This issue will be

Savoiardo Decl. in Opp. to Pl.'s Mot. for Sanctions ("Savoiardo Decl."), Ex. A.  Responses were

provided by the Roosevelt Defendants on August 8, 2011.[3]  *Id.*, Ex. G.  Supplemental responses

to Plaintiff's first set of document requests were served by the Roosevelt Defendants on August

30, 2011.  *Id.*

In the meantime, the parties began to depose witnesses on August 23, 2011.  Thereafter,

by letter dated August 28, 2011, Plaintiff's counsel served what appears to be an informal second

set of document requests on the Defendants, apparently as a "follow up" to the depositions of

Superintendent Robert-Wayne Harris ("Harris") and Assistant Superintendent for Curriculum

and Instruction Roxanne Garcia France ("Garcia-France"). *Id.*, Ex. A.  The August 28 letter

enumerated 17 categories of "documents and items that have not yet been produced that need to

be produced."  Plaintiff's counsel also sent a deficiency letter to all Defendants on August 31,

2011, setting forth issues Plaintiff had with the August 8, 2011 responses provided by the

Roosevelt Defendants and indicating that he did not believe that Defendant Funderburke had sent

any responses to his July 14 discovery demands.  *Id.*, Ex. A.

Funderburke's counsel responded to Plaintiff's letters on September 8, 2011, indicating

that her client did not have any of the documents requested within her possession or control.  *See*

Louis D. Stober, Jr. Decl. in Supp. of Mot. ("Stober Funderburke Decl."), Ex. B.   The Roosevelt

Defendants provided formal responses to the August 28 requests on October 18, 2011.

Savoiardo Decl., Ex. B.  The Roosevelt Defendants also provided certain documents in an

_____

addressed in further detail below.

[3]      Based on the submitted record, the Court cannot confirm when or if Defendant
Funderburke provided responses to Plaintiff's demands.

attachment to a September 13, 2011 e-mail directed to Plaintiff's counsel. *Id.*, Ex. D. Subsequently, attached to a letter dated January 27, 2012, the Roosevelt Defendants provided Plaintiff's counsel with additional documents in response to his "continuing discovery demands." *Id.*, Ex. E.

## III. LEGAL STANDARD

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A court may impose sanctions against a party who spoliates evidence pursuant to Rule 37(b) of the Federal Rules of Civil Procedure as well as through the Court's inherent powers to control the judicial process and the litigation before it. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002); *West*, 167 F.3d at 779. A party seeking spoliation sanctions in the form of an adverse inference instruction has the burden of establishing "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp.*, 306 F.3d at 107 (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001)); *accord Zubulake v. UBS Warburg LLC ("Zubulake V")*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004).

With regard to the *non-production* of evidence, "[a] failure to disclose under Rule 37 encompasses both the destruction of evidence, or spoliation, and untimely production of documents and information required to be produced." *In re Sept. 11th Liab. Ins. Coverage*

*Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007). Therefore, in applying a test closely analogous to

that for spoliated evidence, *Residential Funding* established that a party seeking an adverse

inference instruction based on the non-production of evidence bears the burden of showing

"(1) that the party having control over the evidence had an obligation to timely produce it;

(2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and

(3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable

trier of fact could find that it would support that claim or defense." 306 F.3d at 107.

In situations where sanctions are warranted, district courts have broad discretion in

"crafting an appropriate sanction for spoliation." *West*, 167 F.3d at 779; *see also Fujitsu Ltd. v.

Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The determination of an appropriate

sanction for spoliation, if any, is confined to the sound discretion of the trial judge."); *Reilly v.

Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent

power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party

for discovery abuses."). The applicable sanction "should be molded to serve the prophylactic,

punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779.

Stated another way, the selected sanction should be designed to "(1) deter parties from engaging

in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the

risk; and (3) restore the prejudiced party to the same position he would have been in absent the

wrongful destruction of evidence by the opposing party." *Id.* (internal quotation marks omitted).

For instance, the spoliation of evidence "can support an inference that the evidence would have

been unfavorable to the party responsible for its destruction." *Zubulake V*, 229 F.R.D. 422, 430

(S.D.N.Y. 2004) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). Courts

are quick to note, however, that a sanction in the form of an adverse inference instruction "is an extreme sanction and should not be imposed lightly." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008); *see also Zubulake v. UBS Warburg LLC ("Zubulake IV")*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003) ("In practice, an adverse inference instruction often ends litigation-it is too difficult a hurdle for the spoliator to overcome."). With these principles in mind, the Court now turns to a discussion of the underlying circumstances giving rise to Plaintiff's claims of spoliation.

## IV.   DISCUSSION

As indicated above, Dr. Curcio seeks spoliation sanctions against Wilhelmina Funderburke and the Roosevelt Defendants. Since the evidence purportedly destroyed or missing and the grounds for such sanctions differ between these Defendants, the Court will address each motion separately.

### A.   Defendant Funderburke

Dr. Curcio argues that during Funderburke's September 30, 2011 deposition, she admitted that she carried a notebook with her and kept notes of her visits to the District from 2008 through 2011. It is the Plaintiff's contention that Funderburke failed to preserve her notebooks as well as other notes she took during Board meetings and took no steps whatsoever to preserve these notes until sometime in 2011, when she was served with Plaintiff's document demands. To prevail on his claim of spoliation, Dr. Curcio must prove that Funderburke "had an obligation to preserve evidence, acted culpably in destroying it, and that the evidence would have

been relevant to the aggrieved party's case. *Ramirez v. Pride Dev. & Constr.*, 244 F.R.D. 162, 164 (E.D.N.Y. 2007).

### 1. Duty to Preserve

The first element a party must show when seeking sanctions for the destruction of evidence is "that the party having control over the evidence had an obligation to preserve it at the time it was destroyed." *Residential Funding Corp.*, 306 F.3d at 107. The Second Circuit has determined that "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu*, 247 F.3d at 436 (citing *Kronisch*, 150 F.3d at 126). Pursuant to this obligation, "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." *Zubulake IV*, 220 F.R.D. at 217. "In this respect, 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'" *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)). Therefore, "[w]hile a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake IV*, 220 F.R.D. at 217.

The Plaintiff argues that Funderburke should have anticipated litigation as early as September 2008, the point in time when Funderburke allegedly made her first racist verbal attack towards him. As such, it is the Plaintiff's claim that Funderburke's duty to preserve all relevant

evidence attached in September 2008.  Alternatively, Dr. Curcio argues that Funderburke's duty to preserve arose, at the latest, in July 2009, when the EEOC charge was filed.  Funderburke, on the other hand, maintains that she was not aware of Plaintiff's charge of discrimination until some time after July 31, 2009 when the District Human Resources Department received the EEOC charge and subsequently mailed it to her.  Funderburke maintains that there are no facts that would show she should have anticipated litigation prior to receipt of the EEOC charge.

While it is true that under certain circumstances a duty to preserve evidence in an employment discrimination case can arise prior to the filing of a complaint or EEOC charge, the record in this case does not support such a determination.  Even assuming Funderburke made racially motivated comments to Plaintiff in September 2008, the Court sees no basis to conclude that Funderburke should have known the moment the statement was made that litigation was going to follow.  This Court has had occasion to address a similar argument by a plaintiff seeking an adverse inference instruction for the spoliation of evidence in a case brought under the Americans with Disabilities Act.  *See Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162 (E.D.N.Y. 2009).  In *Scalera*, the plaintiff argued that since defendants had a duty to accommodate the plaintiff's known disability, which included the installation of a handrail at the side entrance to the building where Plaintiff worked, the defendants should have known that they were potentially liable for failing to accommodate the plaintiff when she fell at that location. 262 F.R.D. at 166.  As such, the plaintiff claimed that the defendant's obligation to preserve information arose immediately following plaintiff's fall.  *Id.*  Finding plaintiff's argument unpersuasive, this Court held:

> Plaintiff's argument that (1) because Defendants knew of Plaintiff's "disability" (the exact contours of which have not been defined), they knew or should have known that she needed the specific accommodation of a handrail at the side door, and (2) because they knew that her injury was caused by a lack of that handrail should have led Defendants to conclude that Plaintiff would bring a disability discrimination lawsuit against them, pushes the logic of such argument, in the Court's view, beyond the boundary of reasonableness.

*Id.* at 172.

The reasoning in *Scalera* applies equally here. Even assuming the statements were made, just because Funderburke was aware or should have known that her statements were racially biased, it does not mean that she should have anticipated Plaintiff's filing an employment discrimination action against her that very instant. *See Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 746 (S.D.N.Y. 2011) (denying plaintiff's argument that defendant's duty to preserve arose the minute defendants allegedly started making copies of plaintiff's materials in a copyright infringement case ). The Plaintiff has not cited any case where the duty to preserve as argued here was adopted by a court. In fact, the circumstances in this case vary significantly from those cases which found that a party had a duty to preserve evidence prior to any form of litigation. *See Siani v. State Univ. of N.Y. at Farmingdale*, No. CV 09-407, 2010 WL 3170664, at *5-6 (E.D.N.Y. Aug. 10, 2010) (finding duty to preserve arose prior to defendants' receipt of the EEOC charge in March 2008 in light of the fact that (1) plaintiff had raised concerns he was a victim of ongoing discrimination at a meeting with defendants in January 2008 and (2) plaintiff sent a letter to defendants noting his belief that a prima facie case of discrimination existed and that he intended to pursue several paths of investigation in March 2008); *Zubalake IV*, 220 F.R.D. at 217 (finding duty to preserve arose prior to the August 2001

EEOC charge where plaintiff's immediate supervisor admitted at his deposition that he feared litigation in April 2001 and various e-mails indicated "almost everyone associated with Zubulake recognized the possibility that she might sue.").

While the Court finds no basis to conclude that Funderburke's duty to preserve evidence arose in September 2008, there is support, both legally and factually, for concluding that Funderburke's duty arose no later than the time Funderburke received Plaintiff's EEOC charge *See Scalera*, 262 F.R.D. at 171 (finding that "the duty to preserve relevant emails arose as of the time Defendants received Plaintiff's EEOC Charge."). Funderburke states in a January 13, 2012, affidavit that she was not made aware of Plaintiff's EEOC charge of employment discrimination against the District until she received a copy of the charge as part of a packet supplied to her for a Board meeting. *See* Funderburke Aff. ¶ 6. This statement is buttressed by Funderburke's deposition testimony in which she stated that the EEOC charge was part of a packet that she received in the mail from the school Board. Jeltje DeJong Decl. in Opp. ("DeJong Decl."), Ex. A ("Funderburke Dep.") at 7-8. Although Funderburke indicates that she does not recall when she received the EEOC charge from the school board, Funderburke Aff. ¶ 6, (and her deposition testimony likewise sheds no light on the date of receipt, Funderburke Dep. at 7-8), the record shows that she could not have received the document earlier than July 31, 2009, the date the District received Plaintiff's EEOC charge. *See* DeJong Decl., Ex. B. Therefore, the Court finds that Funderburke's duty to preserve relevant evidence arose, at the earliest, in August 2009.

With the timing of the duty to preserve settled, the Court turns to the question of whether Funderburke failed to preserve evidence, notwithstanding such a duty. Dr. Curcio argues that Funderburke failed to preserve her notes which were contained in notebooks as well as on

documents handed out during board meetings. As for keeping notes during board meetings, Funderburke stated that she did not keep such notes in her notebooks, but, instead, would take notes directly on the board sheets or agendas provided at the meeting. Funderburke Dep. at 16; Funderburke Aff. ¶ 5. Funderburke acknowledged that she kept the board sheets or agendas on which she made notes. Funderburke Dep. at 16-17. As for the notebooks, Funderburke confirmed during her deposition that she kept a notebook during the years 2008, 2009, 2010 and 2011. *Id.* at 15. According to Funderburke, she kept such notes regarding "[e]vents that happen when I go visit the school district." *Id.* at 11. In response to a question during her examination concerning whether there is a "notebook that has notes of events between you and Dr. Curcio," Funderburke stated that "[i]t's someplace, but I wasn't able to find it. I have been looking and looking, but I had a fire in my house." *Id.* at 11. Funderburke later clarified that on January 19, 2009, her house caught fire and all of her personal documents, including her notes and notebooks were destroyed. Funderburke Aff. ¶¶ 7-8. This fire, which apparently wiped out all of her notes as of January 19, 2009, occurred at a time which pre-dated Funderburke's obligation to preserve evidence (*i.e.*, August 2009). However, the event of the fire does not answer the question whether Funderburke breached her duty to preserve any notes taken *after* January 19, 2009.

Funderburke stated that right after the fire, she moved into a "very small trailer which was placed on her property" for three years. Funderburke Aff. ¶ 7. According to Funderburke, "[a]fter moving into the trailer, I did not take or keep any notes, since there was no room to store any paperwork." *Id.* ¶ 8. The Court finds this statement in Funderburke's sworn affidavit to be at odds with her deposition testimony. For instance, Funderburke acknowledged that she kept a notebook for the years 2009, 2010 and 2011. Funderburke Dep. at 15. In fact, at her deposition,

12

Funderburke brought her most recent notebook with her. *Id.* at 11-13, 15. When asked where the notebooks for the other years were, Funderburke replied that "I really don't know." *Id.* at 15. This is not the only discrepancy in Funderburke's statements. During her September 2011 deposition, Funderburke acknowledged that she kept her marked up board meeting materials/sheets. She also indicated it was probable that she would have in her possession board sheets of meetings in which any interaction between her and Dr. Curcio was written down. Funderburke Dep. 16-17. When Funderburke was questioned about the notes on the board agenda sheets again, she explained: "to tell you the truth, I got so much paper from the three years I been on that it would be hard for me to go back and find these papers." *Id.* at 116. However, some four months after her deposition, when she provided her January 2012 affidavit in opposition to the current motion, Funderburke asserts that "[a]t some point after January 19, 2009, I stopped keeping notes, simply because I had no room to keep or store them." Funderburke Aff. ¶ 5. This open ended statement of when Funderburke purportedly stopped taking notes falls far short of establishing that Funderburke did not breach her duty to preserve her notes. Funderburke's acknowledgement that "I have looked through my belongings to see if there are any notes anywhere, and I have not found any notes," is quite telling. Funderburke Aff. ¶ 8. Based on all of this information, the Court finds that Funderburke had a duty to preserve her notes since they were, at the very least, relevant to the subject matter involved in this action. *See Zubulake IV*, 220 F.R.D. at 218 (finding that the duty to preserve extends to any documents or tangible things that are considered relevant under Rule 26 of the Federal Rules of Civil

Procedure).  Accordingly, Funderburke failed to preserve her notes which existed in or after

August 2009, the time the duty to preserve attached.[4]

## 2.    *Culpable State of Mind*

"Even where the preservation obligation has been breached, sanctions will only be

warranted if the party responsible for the loss had a sufficiently culpable state of mind."  *In re*

*WRT Energy Sec. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y. 2007).  Failures to preserve and produce

relevant evidence occur "along a continuum of fault-ranging from innocence through the degrees

of negligence to intentionally."  *Reilly*, 181 F.3d at 267 (quoting *Welsh v. United States*, 844 F.2d

1239, 1246 (6th Cir. 1988)).  In this Circuit, "the culpable state of mind' factor is satisfied by a

showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to

preserve it], or negligently.'"  *Residential Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie*, 243

F.3d at109).  A party is negligent even if the failure "results from a pure heart and an empty

head."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F.

Supp. 2d 456, 464 (S.D.N.Y. 2010).

---

[4]     The Court finds no merit in Plaintiff's request for an adverse inference instruction based
on Funderburke's failure to produce the notebook that she brought with her the day of her
deposition.  While the Second Circuit confirmed in *Residential Funding Corp.* that an adverse
inference instruction may serve as a proper sanction for a party's failure to produce evidence, 306
F.3d at 107, such a sanction is not justified here.  In this case, Plaintiff's counsel requested the
production of the notebook at Funderburke's deposition.  Funderburke Dep. at 12-13.
Funderburke's counsel took the request "under advisement" but also indicated that "I don't think
we are going to produce it right now" based on the fact that counsel had not had a chance to look
through the notebook herself and the fact that Funderburke clearly stated that there was nothing
in the book regarding Dr. Curcio.  *Id.* at 13.  There is no representation from the Plaintiff that any
follow up request or discussion over the notebook occurred between the parties.  Nor was there
any effort by the Plaintiff to seek court intervention over this particular notebook.  Therefore, the
Court finds no basis for sanctions premised on the allegation that  Funderburke failed to produce
the notebook that was brought to her deposition.

Dr. Curcio argues that Funderburke took no steps whatsoever to preserve documents and that her actions were, at a minimum, grossly negligent. This argument is premised on Funderburke's purported failure to put a litigation hold in place at the outset of litigation. Courts have concluded that "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake IV*, 220 F.R.D. at 218. It is important to note, however, that the present circumstances, as they relate to Funderburke, are dissimilar to *Zubulake IV* and most other cases addressing litigation holds and document retention policies in the context of a spoliation motion because the alleged spoliator here is not a corporation or a municipality. The context here is a much simpler one than the court addressed in *Zubulake IV* – Funderburke is an individual and the spoliation claim relates solely to her handwritten notes. *See Neverson-Young v. Blackrock, Inc.*, No. 09 Civ. 6716, 2011 WL 3585961, at *3 (S.D.N.Y. Aug. 11, 2011) (finding plaintiff who donated her laptop "merely negligent" based on the fact that "[i]n contrast to corporate actors . . . [plaintiff] is unsophisticated and unaccustomed to the preservation requirements of litigation."). While the Court has found that Funderburke's duty to preserve attached when she became aware of the EEOC charge, there is nothing in the materials submitted to suggest Funderburke had any legal representation of her own until after the instant federal Complaint was filed in December 2010. Therefore, Dr. Curcio's suggestion that Funderburke had the requisite culpable state of mind because she did not come forward with proof that a written legal notice was given to her to cease destruction of any evidence in August 2009 must fail for lack of a reasonable foundation.

15

Some courts have categorically held that "the failure to implement a litigation hold at the outset of litigation amounts to gross negligence." *Toussie v. Cnty. of Suffolk*, No. CV 01-6716, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007) (citing *Chan v. Triple 8 Palace*, No. 03 CIV 6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005)).  In the context of a motion brought solely against Funderburke (an individual, not a municipality as in *Toussie*) for destruction of her handwritten notes, such a blanket conclusion of gross negligence elevates form over substance. *See Orbit One Comm'ns, Inc.*, 271 F.R.D. at 441 ("Indeed, under some circumstances, a formal litigation hold may not be necessary at all."); *see also Byrnie*, 243 F.3d at 108 (concluding that "a case by case approach was appropriate" when determining a party's culpability).  In fact, while this Court has had the pending motions under review, the Second Circuit "reject[ed] the notion that a failure to institute a 'litigation hold' constitutes gross negligence *per se*." *Chin v. Port Auth. of N.Y. & N.J.*, --- F.3d ----, 2012 WL 2760776, at *21 (2d Cir. July 10, 2012).  As such, the Court sees no basis to hold that Funderburke was grossly negligent in failing to preserve her notes due to the lack of a litigation hold.[5]

There is a basis, however, to conclude that Funderburke acted with the requisite culpable state of mind.  As previously discussed, the fire which engulfed Funderburke's residence in January 2009 does not excuse the production of notes that were created subsequent to the fire.

---

[5]      To the extent Plaintiff argues that Funderburke has provided no proof that a litigation hold was implemented once she obtained counsel, such an argument would fail since there is no proof that she breached her duty to preserve evidence at that point.  Indeed, Funderburke brought her current notebook to the September 30, 2011 deposition.  There is no evidence to suggest that this notebook did not contain notes from December 2010 to the date of the deposition nor has Plaintiff's counsel ever sought timely relief from the Court to pursue this issue further.  Moreover, Funderburke unequivocally testified that the notebook with her that day did not contain any notations of events, meeting or conversations between Dr. Curio and herself or any other employee of the District.  Funderburke Dep. at 11, 13-14.

When questioned about the location of her notebook which contained notations of events between her and Dr. Curcio, Funderburke explained that "[i]t's someplace, but I wasn't able to find it." Funderburke Dep. at 11. Some indication of what happened to the notes can be found in Funderburke's deposition testimony where she admitted that once she filled a notebook, she would obtain a replacement book and throw away the previously completed book. *Id.* at 15-16. Significantly, Funderburke offers no explanation as to what happened to the notes she took on the board agenda sheets which she testified were in her possession in September 2011. *Id.* at 16. Therefore, Funderburke's contention that she "played no role in the destruction of the notes" and that the loss of evidence was "attributable to an event outside [her] control" is lacking in merit. While there is some evidence which suggests that the notebooks were knowingly destroyed, there is enough evidence for the Court to conclude that Funderburke acted in a manner that was negligent in preserving her notes and notebooks.

### 3. Relevance

Finally, to establish the third prong of the spoliation claim, a party must establish that the missing evidence was "relevant" to its claims or defenses. In the context of an application for an adverse inference, *relevance* "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Residential Funding Corp.*, 306 F.3d at 108-09. Instead, the party "must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Id.* at 109 (quoting *Kronisch*, 150 F.3d at 127). In other words, the moving party must show through extrinsic evidence that the destroyed evidence would have been favorable to its case. *See Zubulake V*, 229 F.R.D. at 431. Without such extrinsic evidence

showing that the destroyed evidence would have been helpful in proving a claim or defense, more severe sanctions such as an adverse inference are not warranted. *See Orbit One Comm'ns, Inc.*, 271 F.R.D. at 439. On the other hand, the Second Circuit has made clear that courts must be mindful not to "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence" since it "would subvert the . . . purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction." *Kronisch*, 150 F.3d at 128.

In certain limited circumstances, relevance "may be inferred if the spoliator is shown to have a sufficiently culpable state of mind." *Chan*, 2005 WL 1925579, at *8. For example, if "a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Residential Funding Corp.*, 306 F.3d at 109. Likewise, "a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." *Id.*

Dr. Curcio asserts that the Court should presume relevance in light of Defendant Funderburke's bad faith or grossly negligent destruction of evidence. The Court declines to do so. The Plaintiff, quoting language found in *Zubulake IV* and *Zubalake V*,[6] argues that where evidence is destroyed in bad faith (*i.e.*, intentionally or willfully), that fact alone is sufficient to demonstrate relevance. Even accepting for the sake of argument Plaintiff's interpretation of what constitutes

---

[6]     The Plaintiff has erroneously attributed the language he quotes as coming from the Second Circuit's opinion in *Residential Funding Corp.* However, Plaintiff is actually quoting from Judge Scheindlin's last two *Zubulake* opinions. *See Zubulake IV*, 220 F.R.D. at 220; *Zubulake V*, 229 F.R.D. at 431.

bad faith,[7] this Court has made no such finding that Funderburke destroyed her notes intentionally or willfully.  The Plaintiff also contends that where evidence is destroyed in a grossly negligent manner, that fact alone is also sufficient to demonstrate relevance.  This premise, however, is misleading since "a finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction."  *See Chin*, 2012 WL 2760776, at *21.  In any event, the Court has already determined that Funderburke's actions were negligent rather than grossly negligent.

Since the Court cannot infer that the destroyed evidence was relevant, Dr. Curcio must demonstrate through extrinsic evidence, such as other existing documents or deposition testimony, that a reasonable jury could find that the missing notes would have been favorable to his claims.  The evidence submitted by Dr. Curcio consists of eight (8) pages from the September 2011 deposition of Funderburke.  While Plaintiff argues that the destroyed/missing documents would have shown that Funderburke discriminated against the Plaintiff based on his race, retaliated against the Plaintiff because he filed an EEOC charge and forced the Plaintiff to work in a hostile work environment based on her constant racial outbursts, the submitted evidence does not support this contention.

---

[7]     Notwithstanding the language contained in *Zubulake IV* and *Zubulake V*, the Court believes that Dr. Curcio's interpretation of bad faith vis-a-vis intentional or willful conduct is inconsistent with the Second Circuit's treatment of these terms of art, which the Second Circuit does not consider interchangeable.  *See Byrnie*, 243 F.3d at 108-09 (distinguishing between the intentional destruction of evidence and the destruction of evidence in bad faith); *see also Residential Funding Corp.*, 306 F.3d at 110 ("[T]he intentional or grossly negligent destruction of evidence *in bad faith* can support an inference that the destroyed evidence was harmful to the destroying party." (emphasis added)).  In the discovery context, the Second Circuit has defined "bad faith" as "an intent to obstruct the opposing party's case." *Byrnie*, 243 F.3d at 109.  This definition clearly has a built in moral culpability requirement that is lacking in the intentional or willful destruction of evidence.

Plaintiff claims that Funderburke took "detailed notes" regarding all of her visits to the District, which included her interactions with Dr. Curcio as well as meetings/interactions she had with the Superintendent and other staff regarding Dr. Curcio. The Court finds this contention to be somewhat overblown in light of the actual testimony given by Funderburke. In the excerpted pages of the transcript submitted to the Court, there is no reference by Funderburke to meetings she had with the Superintendent or any other staff members regarding the Plaintiff. Funderburke did state that she took notes of "[e]vents that happen when I go visit the school district." Funderburke Dep. at 11. However, and contrary to Plaintiff's claim that she took detailed notes regarding every visit, Funderburke testified that she only took notes of things she felt were important. Funderburke extrapolated on her note-taking as follows:

> I keep a bound notebook with me in which I write what I believe to be important information at the time of the writing. I will use the notebook as a reference and a sort of calendar to help remind me of tasks that I need to do. . . . The notebook contains such information as the telephone numbers for the board members and the dates of certain planned school events. The notebook contains notes that serve as a reminder to me that I have to be at a certain place or that I have to do a certain task.

Funderburke Aff. ¶ 4. While Funderburke did indicate at one point that there were notes which involved the Plaintiff, there is no evidentiary basis to conclude that these missing notes would have been any more helpful to Dr. Curcio than they would have been to Funderburke. Dr. Curcio focuses his attention expressly on having the Court *presume* relevance. In doing so, he fails to articulate any argument why the notes would be favorable to his case or, more importantly, how the submitted deposition testimony of Funderburke confirms that fact. What is left is mere speculation on the part of the Plaintiff. While the Court appreciates the difficulty of coming

forward with evidence that would tend to prove the contents of lost or otherwise destroyed documents, the Court is of the opinion that the Plaintiff had the ability to garner more information about the missing notes during Funderburke's deposition. For whatever reason, many questions that could have shed light on the contents of these notes appear to have never been asked. Therefore, based on the record present here, the Court finds that there is insufficient evidence to permit a reasonable trier of fact to conclude that the destroyed notes would have shown unlawful discrimination or would have otherwise been favorable to Dr. Curcio. Accordingly, a sanction in the form of an adverse inference instruction against Funderburke is not warranted.

### 4.     *Appropriate Sanction*

Although the Court finds that an adverse inference instruction is not warranted, Funderburke is not exonerated here. Notwithstanding the fact that Dr. Curcio has not met his burden to establish that the destroyed notes would have been favorable to his claims, Defendant Funderburke was negligent in complying with her obligation to preserve her notes. In situations where the spoliating party acted with the requisite culpable state of mind but did not prejudice the party seeking sanctions, courts are directed to consider lesser sanctions, including awarding the costs of making the motion for sanctions. *See Residential Funding Corp.*, 306 F.3d at 112; *see also Pension Comm.*, 685 F. Supp. 2d at 467 ("For less severe sanctions–such as fines and cost-shifting–the inquiry focuses more on the conduct of the spoliating party than on whether documents . . . were relevant."). Based on the fact that Funderburke was negligent in complying with her obligation to preserve her notes, the Court finds that a monetary sanction is appropriate.

The amount of the sanction will be equal to the reasonable costs Plaintiff incurred in making the instant motion for spoliation sanctions, including reasonable attorneys' fees.[8]

## B.     Roosevelt Defendants

Dr. Curcio alleges that the Roosevelt Defendants have destroyed or failed to produce the following evidence: (1) audiotape recordings of the Board of Education meetings from June 2008 through June 30, 2011; (2) videotape recordings of the Board of Education meetings from June 2008 through June 30, 2011; (3) Assistant Superintendent Garcia-France's evaluations and resume; (4) documents Superintendent Harris submitted to the New York State Education Department regarding Defendant Funderburke; (5) an original copy of the 2010-2011 evaluation of Dr. Curcio; (6) the District's legal bills from Guercio & Guercio from 2008 through the present; (7) Superintendent Harris' 2008 written evaluations of Dr. Marlene Zakierski, Assistant Superintendent for Human Resources and Professional Development; (8) Superintendent Harris' employment contracts with the District from 2008 through the present, including his renewal contracts for 2010 and 2011; (9) the original envelope and contents of the April 15, 2011 denial of tenure letter for Dr. Curcio; (10) the draft Professional Development Plan; (11) documents showing the large number of grievances existing at the time Dr. Curcio was hired; and (12) Board meeting minutes and amended agendas.  With regard to some of the above evidence, the Plaintiff also claims that although such material was ultimately produced, the production was untimely, which permits this Court to award spoliation sanctions, including an adverse inference, against the Roosevelt Defendants.

---

[8]     The Court stresses that only those attorneys' fees associated with making the motion for spoliation sanctions against Defendant Funderburke will be awarded.

To receive an adverse inference instruction, the moving party must satisfy his burden of establishing three elements, one of which – relevance – requires proof through extrinsic evidence. Therefore, to make out a claim for spoliation, the quality of the proof trumps the quantity of allegedly spoliated evidence. Here, the Plaintiff has elected to enumerate individually "the voluminous evidence that Defendant[s] failed to preserve and produce" and then assert that the sheer "volume" is sufficient proof that he satisfied his burden. As will be shown below, this strategy is fundamentally flawed.

Before turning to the specific evidence at issue, the Court finds it beneficial to address those issues which impact the determination whether sanctions for the destruction of evidence are warranted, regardless of the type of evidence allegedly missing. First, the parties disagree over when the Roosevelt Defendants' duty to preserve evidence attached. Similar to his motion for spoliation sanctions against Defendant Funderburke, Dr. Curcio maintains that the Roosevelt Defendants should have anticipated litigation as early as September 2008 because Superintendent Harris knew immediately following Funderburke's initial racial attack that her actions were discriminatory and exposed the District to possible litigation. In light of Harris' position as Superintendent, the duty to preserve would be triggered for the Roosevelt Defendants at the point when Harris anticipated litigation. However, Plaintiff's argument as to the timing of that duty is undermined by the factual record for the same reasons articulated above concerning the motion for spoliation against Funderburke. In fact, the case militating against any duty to preserve attaching to the Roosevelt Defendants in September 2008 is even stronger since Funderburke did not join the Board until November 18, 2008. *See* Funderburke Aff. ¶ 1. The Roosevelt Defendants' duty

to preserve evidence, therefore, did not attach until July 2009, the date Plaintiff filed his EEOC charge.[9]

Dr. Curcio next argues that the Roosevelt Defendants' failure to issue a written litigation hold is presumptively grossly negligent and therefore suffices to establish that the Roosevelt Defendants acted with the necessary culpable state of mind. While it is true that certain district courts in this Circuit have categorically held a party to be grossly negligent where that party fails to issue a written litigation hold, the Second Circuit has now "reject[ed] the notion that a failure to institute a 'litigation hold' constitutes gross negligence *per se*." *Chin v. Port Auth. of N.Y. & N.J.*, --- F.3d ----, 2012 WL 2760776, at *21 (2d Cir. July 10, 2012). Instead, the Circuit has adopted the approach which considers a party's failure to implement good preservation practices as one factor in determining whether sanctions should be imposed. *Id.* (citing *Orbit Comm'ns, Inc.*, 271 F.R.D. at 441). In light of *Chin*, the Court concludes that the Roosevelt Defendants' lack of proof that a written litigation hold was implemented does not dispositively alter the Court's analysis of whether sanctions are warranted.

Lastly, the Court denies Plaintiff's request for sanctions based upon the claim that the production of documents by the Roosevelt Defendants was untimely. As previously noted, a party seeking an adverse inference instruction premised on the untimely production of evidence "must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that

---

[9] At one point, the Plaintiff states that "[o]n June 23, 2009, he informed Superintendent Harris that he filed a complaint with the EEOC." *See* Pl.'s Mem. at 4. The Court can only assume that the reference to "June" must be in error as the Plaintiff himself acknowledges that the EEOC Charge was only filed in July 2009. *See* Pl.'s Mem. at 8.

the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp.*, 306 F.3d at 107. To satisfy the first element, Dr. Curcio must show that the Roosevelt Defendants breached their obligation set forth in either Rule 26 or as provided in court orders regulating discovery. *See In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125. Based on the docket history of this case and Plaintiff's own conduct during discovery, the Court concludes that the Roosevelt Defendants did not breach their obligation to timely produce evidence.

The manner in which both sides handled their discovery obligations in this case falls far short of satisfactory, particularly in light of specific Orders issued by the Court which the parties elected not to follow. Among other things, counsel failed to communicate with the Court despite being instructed to do so. As early as the May 27, 2011 conference, counsel were put on notice that the dates in the CMSO would not be adjourned based on the pre-trial conference date issued by Judge Feuerstein. In addition to being given this information verbally during that conference, the Court reiterated the directive in the Civil Conference Minute Order issued after the conclusion of the conference. *See* DE 21. At that time, the Court also set the Discovery Status Conference for August 4, 2011. *Id.*

During the August 4, 2011 Status Conference, counsel were reminded *again* that the September 2, 2011 discovery deadline would not be extended. Unfortunately, these warnings went unheeded as both counsel failed to conduct discovery within the time directed, missed deadlines established by the Court and conducted discovery after those deadlines passed, without

the Court's knowledge or approval.[10]  While Plaintiff highlights many of Defendants' failures during the discovery process, there are sufficient examples of Plaintiff's own shortcomings which impacted the Roosevelt Defendants' ability to timely produce discovery.

Both sides were given a June 17, 2011 deadline by the Court to serve their discovery demands.  Notwithstanding that deadline, counsel for Dr. Curcio did not serve his demands until July 14, 2011, the day before the deadline set by the Court for both sides to serve *responses* to the other's discovery demands.  At no point prior to or after serving Plaintiff's discovery demands did Plaintiff's counsel ever come back to the Court to address any issue which prevented him from complying with the June 17, 2011 deadline, nor did counsel ever request an extension.  With an already condensed discovery schedule, this nearly one-month delay made it unlikely that the parties could complete discovery by the September 2, 2011 deadline.  At the August 4, 2011 Status Conference, Plaintiff's counsel stated that he delayed serving his discovery demands until after he served an Amended Complaint.  That information was not communicated to the Court at the time, nor was any authorization sought.  Having reminded all parties on August 4 that the September 2, 2011 discovery deadline would not be extended by this Court, counsel were advised that any requests for an extension would have to be made directly to Judge Feuerstein.  There is no record in the ECF docket of any such request ever having been made.

---

[10]    Plaintiff's counsel erroneously claims that discovery closed on November 9, 2011.  As clearly set forth in the CMSO, discovery closed on September 2, 2011.  *See* DE 22.  Oddly, Plaintiff appears to be relying on the Court's November 9, 2011 Order certifying the case over to Judge Feuerstein as trial-ready.  *See* DE 44.  The Court's November 9, 2011 Order merely confirmed that discovery had already closed and the case was trial ready based upon the representations of counsel in their Joint Pre-Trial Order.  Nothing in the record even suggests that discovery was extended beyond September 2, 2011.  Instead, counsel selectively relies on language in the Court's November 9, 2011 Order as a basis to argue that his ongoing discovery demands were somehow timely.

Four days after the August 4 Status Conference, Plaintiff's counsel received the Roosevelt Defendants' discovery responses. Although the discovery deadline was less than a month away at this juncture, Plaintiff's counsel waited three weeks after receiving the responses to send letters to the Roosevelt Defendants addressing deficiencies in the document production already made and requesting that additional documents be produced. These letters, dated August 28, 2011 and August 31, 2011, were sent the same week discovery was set to close. By letter dated August 28, 2011, Plaintiff's counsel enumerated 17 categories of additional evidence he wanted produced. Then, on August 31, Plaintiff's counsel sent a letter specifically addressing the Roosevelt Defendants' responses to 17 of the 34 document requests. At not time after receiving the responses of the Roosevelt Defendants did Plaintiff's counsel file a motion to compel or approach the Court in any manner regarding any concerns he had with the discovery responses. The Court is aware that Plaintiff's counsel was experiencing some very unfortunate personal circumstances during October 2011 which prompted counsel to seek an extension from Judge Feuerstein of the filing deadlines for summary judgment motion papers and the Pre-Trial Order.

Discovery closed on September 2, 2011. Neither side filed any discovery motions seeking Court intervention with regard to the other's discovery responses. The next time the Court heard from the parties was upon their filing of the proposed Joint Pre-Trial Order on November 8, 2011. *See* DE 43. Although Plaintiff's counsel identified over 400 exhibits in the Pre-Trial Order, Plaintiff's counsel did not advise the Court that some of the exhibits – those which now serve as the basis for this motion – were never produced. Also unknown to the Court was the fact that counsel continued to conduct discovery, on their own, including document production and

27

depositions, well after discovery closed on September 2, 2011, and without any authorization from the Court.

The Defendants are far from blameless in this process. There is little excuse – and the Roosevelt Defendants do not provide a substantive one – for the post-deadline production of documents on October 18, 2011. And there is a complete lack of justification for producing Board meeting minutes, meeting agendas, and audio cassette/CD recordings of Board meetings on January 27, 2012, nearly five months after the close of discovery and two days before the Defendants' opposition to Plaintiff's motion for spoliation was due. Certainly Plaintiff's own actions in serving discovery a month late did not help. However, that delay was not the cause of the Roosevelt Defendants' ultimate delinquency.

Nevertheless, the Court finds troubling the fact that the Plaintiff never sought Court intervention after receiving the Roosevelt Defendants' initial responses on August 8, 2011. Moreover, the specific documents and items requested by Plaintiff's counsel on August 28, 2011 left the Roosevelt Defendants with virtually no time to comply before the close of discovery on September 2, 2011. While Plaintiff's counsel maintains he only learned of the documents that he requested on August 28, 2011 after depositions began on August 23, the very fact that counsel only began taking depositions the week before discovery was set to close is itself problematic. Unfortunately, Plaintiff's counsel never filed a motion to compel at any time during the discovery period or thereafter. Nor is there any certification in the current motion papers that the parties engaged in a good faith meet-and-confer, pursuant to Loc. Civ. R. 37.3, at any time regarding the Defendants' discovery responses. As noted earlier, the Court is mindful of the difficult personal circumstances of Plaintiff's counsel during the month of October. It is regrettable that the

28

Plaintiff did not seek relief by way of a motion to compel prior to or after that time. Instead, Plaintiff has "leap-frogged" over that procedure and filed the instant motion. The Court finds a motion for sanctions in this form is not a proper substitute for a motion to compel and that the appropriate method to seek Court intervention cannot be bypassed in this manner.

The Plaintiff's attempt to analogize the present facts to those in *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253 (2d Cir. 1999) in order to justify the imposition of sanctions against the Roosevelt Defendants is unpersuasive. Not only is the present action readily distinguishable from *Reilly*,[11] but the Second Circuit there supported the fact that lower courts should employ a "case-by-case approach" when dealing with sanctions requests based on the failure to produce evidence. 181 F.3d at 267. Indeed, the court in *Reilly* concluded that "[t]rial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing-a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." *Id.*

---

[11]  For example, the plaintiff in *Reilly* was a terminated investment bank executive who served document requests seeking all materials concerning his activities while at the bank. 181 F.3d at 259. On reviewing boxes of documents produced by the bank, the plaintiff notified defendant that his personal deal files showing the extent and value of his work for which he was never compensated were missing. The bank insisted they did not have the files and claimed plaintiff's need for them was "bogus." *Id.* at 260. Two business days before the trial commenced, the defendant notified the plaintiff that it had suddenly found the files – "some seven linear feet of documents" – in a 10 x 20 foot kitchen adjacent to the plaintiff's old office. The files were delivered to the plaintiff on Friday at 3 p.m. when trial was set to commence the following Monday *Id.* Dr. Curcio, on the other hand, did not serve the document requests that involve the evidence at issue in this motion until a week before discovery was set to close. In addition, the defendant in *Reilly* produced the missing documents four days before trial. *Id.* at 260. In the present action, not only was trial not imminent at the time this motion was filed, but the Plaintiff utilized the evidence which was claimed to have been untimely produced in opposing Defendants' motion for summary judgment. Finally, the district judge in *Reilly* made a finding that the defendant was grossly negligent in searching for the missing documents and in failing to assure the integrity of the documents. *Id.* at 262. Such circumstances are not present here.

Based on the Court's review of the facts and the history of this case, the Court concludes that imposing the type of sanctions Plaintiff is seeking against the Roosevelt Defendants for their untimely production of evidence is not warranted. Therefore, to the extent Dr. Curcio seeks sanctions pursuant to documents or audiotapes that were ultimately produced, the Court finds that the Roosevelt Defendants did not breach their obligation as the standard requires, to timely produce this evidence in light of the disregard of the deadlines contained in the CMSO.

With this understanding, the Court now turns to the specific evidence at issue, which essentially can be grouped in three categories: (1) audiotapes; (2) videotapes; and (3) documents. The Court will address each category in turn.

### 1. *Audiotapes*

The first category of evidence which Dr. Curcio claims was not preserved is audiotape recordings of Board of Education meetings from June 2008 through June 30, 2011. The Plaintiff maintains that the Roosevelt Defendants have intentionally destroyed audiotapes and specifically alleges that after the September 24, 2008 Board meeting, the District Clerk intentionally began to destroy audiotapes by recording over them. The Roosevelt Defendants counter this accusation by arguing that all audio recording of Board meetings that are in their possession have been provided to the Plaintiff, and the only arguably relevant tape not produced was contaminated during a remediation of the District's storage facility. Therefore, it is the Roosevelt Defendants' position that while they were properly preserving all tapes, their efforts at due diligence were affected and impaired by asbestos and lead contamination.

As the outset, the Court disagrees with the Roosevelt Defendants' contention that the audiotape from the September 24, 2008 Board meeting is the *only* relevant audiotape. The Roosevelt Defendants assert that Plaintiff's discrimination claims arise from six statements admittedly made by Funderburke from September 24, 2008 through December 3, 2009. Of these six, the Roosevelt Defendants maintain that the only allegedly discriminatory remark made by Funderburke at a public portion of a Board meeting occurred on September 24, 2008. The Roosevelt Defendants explain that this fact is critical to the instant motion since only the public portions of Board meetings were recorded. However, the Roosevelt Defendants' reasoning contains one notable flaw – the Plaintiff's Amended Complaint is not limited to six allegedly discriminatory statements made by Funderburke. In the Amended Complaint, Dr. Curcio alleges that Funderburke's discriminatory remarks occurred during at least 11 Board meetings from September 2008 through January, 2010. *See* Am. Compl. ¶ 20. To the extent that the Roosevelt Defendants challenge this contention and raise other "legal obstacles" to finding these Defendants liable, this Court is not in a position to make such dispositive findings. Indeed, the Roosevelt Defendants' motion for summary judgment is currently pending before Judge Feuerstein. Therefore, the Court's analysis of Plaintiff's spoliation motion is not limited to just the September 24, 2008, audiotape and such analysis will address all of the allegedly missing audio recordings from June 2008 through June 30, 2011.

There is no dispute that certain Board meetings were recorded by the District. However, District Clerk James Milam ("Milam"), the individual responsible for making the audio recordings of Board meetings, clarifies that only the *public* portions of the Board meetings were recorded. Aff. of James Milam ("Milam Aff.") ¶ 2. Milam, who was approved by the Board to

serve as District Clerk in July 2010, states that all audio recordings after he became Clerk were on CDs which have been provided to counsel. *Id.* ¶ 5. As for the recordings prior to his appointment, Milam indicates that they were recorded on audio cassettes and archived in the basement of the High School located at 240 Denton Place. *Id.* ¶¶ 6-7. The District used the basement of the High School as a record storage facility. Aff. of Greg Hamilton ("Hamilton Aff.") ¶ 4. However, Milam further notes that due to a renovation project at the High School in the summer of 2010, the District's archived records were moved to the "Harry Daniels" Building. Milam Aff. ¶ 8.

Further information regarding this project is provided by Greg Hamilton, who has been employed by the District since July 2009 as the Assistant Business Administrator for Facilities and Operations. Hamilton Aff. ¶ 1. Hamilton explains that in 2009, as part of the planned renovation at the High School, testing of the basement where the records were stored revealed the presence of asbestos and lead dust contamination. *Id.* ¶ 2. In particular, testing for lead contaminates was conducted in April 2009 by AKRF, Inc. *Id.* ¶ 3 & Exs. A-B. Wipe samplings performed of surfaces in the basement, including the record storage area, came back positive for lead dust contamination. *Id.* ¶¶ 6-7 & Ex. C. Additional testing further revealed the presence of asbestos. *Id.* ¶ 9 & Ex. E. As a result, AKRF provided a table of items to be decontaminated, which included approximately 680 file boxes containing school records. *Id.* ¶ 8 & Ex. D. Ultimately, the lead and asbestos abatement project was awarded to PAL Environmental Safety Corporation ("PAL"). *Id.* ¶ 10 & Ex. F. PAL's lead and asbestos abatement work plan consisted of a Phase I lead dust and debris cleanup, and Phase II asbestos abatement. *Id.* ¶ 11 & Ex. G. According to Hamilton, at the beginning of the abatement project in the summer of 2010, PAL

attempted to remediate several hundred boxes of school records which had been contaminated within the basement. *Id.* ¶ 14. The records found to be safe after testing were moved by Hamilton's staff into the Harry Daniels Building, while those found unsafe were carted off with the other contaminated debris. *Id.* ¶¶ 15-16.

Milam affirms that in September 2011, he requested that Greg Hamilton have a search conducted of the archived records to locate all audio recordings of Board meetings. Milam Aff. ¶ 9. Milam's request was confirmed by Hamilton who assigned Mason Rahynes, a custodial supervisor, to conduct the search of the archived records located at the Harry Daniels Building. Hamilton Aff. ¶¶ 18-19. Rahynes states that he searched all of the boxes in the Harry Daniels Building by visually inspecting the contents of several hundred boxes. Aff. of Mason Rahynes ("Rahynes Aff.") ¶¶ 4-5. The search took two full days to complete. *Id.* ¶ 5. Rahynes' search uncovered a single banker's box containing a collection of audio tapes from Board meetings. Rahynes Aff. ¶ 8; Milam Aff. ¶ 10; Hamilton Aff. ¶ 20. The banker's box containing the tapes was given to Milam. Rahynes Aff. ¶ 9; Hamilton Aff. ¶ 21. Milam states that the box contained tapes of Board meetings prior to June 2001 and others from July 30, 2009 to June 2010. Milam Aff. ¶¶ 10-11. The banker's box also contained audio recordings from the July 24, 2008, and December 18, 2008 Board meetings. *Id.* ¶ 11. On January 17, 2012, at the request of Milam, a second search of the archived records was conducted by Rahynes. Hamilton Aff. ¶ 22; Rahynes Aff. ¶¶ 10-11. This search did not uncover any additional tapes. Hamilton Aff. ¶ 23; Rahynes Aff. ¶ 12.

The Roosevelt Defendants maintain that they produced all audio recordings of Board meetings from January 2009 to January 2012, as well as recordings of the July 24, 2008 and December 18, 2008 meetings in response to Plaintiff's request dated August 28, 2011. Evidence of this production can be found in the Roosevelt Defendants' production dated January 27, 2012. *See* Savoiardo Decl., Ex. J. Attached to the Roosevelt Defendants' letter dated January 27, 2012, is a chart listing the cassettes and CDs that were disclosed. *Id.* This chart identifies audio recordings from 48 Board meetings that were produced. In addition to the July 24 and December 18 recordings from 2008, the Roosevelt Defendants provided Plaintiff with 16 recordings from 2009, 12 recordings from 2010, 17 recordings from 2011 and a single recording from 2012. *Id.*

Notwithstanding the production of these audiotapes, Dr. Curcio argues that the Defendants falsely represented that these recordings did not exist and only produced the recordings in response to the instant motion. The only evidence of this purported false representation is a November 8, 2011 e-mail sent from counsel for the Roosevelt Defendants to Plaintiff's counsel. *See* Stober Decl. II, Ex. B. This e-mail, which speaks only to the District's not having documents listed in the proposed Pre-Trial Order, does not make any reference to audiotapes. In addition, the Court finds Plaintiff's questioning of the authenticity of the provided audiotapes to be unsupported. Therefore, while troubled by the January 27, 2012, unquestionably late production of audiotapes which the Roosevelt Defendants acknowledge they had recovered in September 2011, the Court has already determined that spoliation sanctions are not warranted on this basis.

With regard to the audiotapes not produced, the Plaintiff has failed to sustain his burden of establishing the necessary elements set forth in *Residential Funding Corp.* to merit spoliation sanctions based on the destruction of the audiotapes. The Roosevelt Defendants concede that they do not possess certain audiotapes due to lead and asbestos contamination. Even assuming the Roosevelt Defendants had an obligation to preserve the audiotapes at the time they were destroyed, the Court finds that the audiotapes were destroyed through no fault of the Roosevelt Defendants. The Court is satisfied – having evaluated the various affidavits and exhibits submitted – with the Roosevelt Defendants' explanation that the audiotapes not produced were contaminated along with other audiotapes being held in storage and were carted off with other contaminated debris by PAL. The Plaintiff nevertheless argues that the Roosevelt Defendants have failed to provide any evidence that the missing tapes had been laced with asbestos or were even destroyed. *See* Reply Mem. at 7-8. This contention is confusing, flawed, and not reasonable in these specific circumstances. First, it is the Plaintiff's burden to show that the evidence was, at a minimum, destroyed negligently. Instead of making such a proffer, Plaintiff's counsel attacks the evidence that was submitted by the Roosevelt Defendants. This approach improperly suggests that it is the Roosevelt Defendants' burden to disprove that they had the requisite culpable state of mind. Second, to the extent the Plaintiff is arguing that the audiotapes were not destroyed but are being intentionally withheld by the Roosevelt Defendants, counsel has not provided a single piece of evidence to support this theory.

The Court also rejects Plaintiff's arguments surrounding the Roosevelt Defendants' collection and retention practices. The Court has already dismissed Plaintiff's contention that the failure to institute a written litigation hold constitutes gross negligence *per se*. Contrary to Dr.

Curcio's claim that the District Clerk had a policy of erasing audiotapes around September 2008, many recordings subsequent to September 2008 have been produced. The Court is not persuaded that the Roosevelt Defendants' efforts in preserving and storing the audiotapes in the basement of the High School or the District's search for the audiotapes were utterly deficient as suggested. Since the Plaintiff has failed to meet his burden of showing that destroyed audiotapes amounted to negligence on the part of the Roosevelt Defendants, Plaintiff's motion for spoliation sanctions based upon unproduced audiotapes is denied.

### 2. *Videotapes*

Another category of evidence allegedly spoliated by the Roosevelt Defendants are videotape recordings of Board meetings from June 2008 through June 30, 2011. Specifically, it is Dr. Curcio's position that the District failed to preserve videotapes which were delivered to the District by Frank Scott ("Scott"). The sole support for this assertion is the unsworn statement of Plaintiff's counsel that after serving Scott with a subpoena to obtain the tapes of the meetings, Scott left a message indicating that he had given all the videotapes to the District. *See* Pl.'s Mem. at 5.

To refute Plaintiff's claim, the Roosevelt Defendants have submitted an affidavit from Scott which states that prior to and after becoming a Board member, he videotaped the public portions of the Board meetings in his personal capacity, not as a member of the Board or pursuant to any directive of the Board. Aff. of Frank Scott ("Scott Aff.") ¶¶ 2-4. The uncontradicted sworn testimony of Scott recounts his practice of reviewing the VHS videotape of the previous Board meeting in his home before the next Board meeting. *Id.* ¶ 5. Thereafter, Scott advises that he would reuse the same videotape to record the next meeting. *Id.* ¶ 6.

The Court notes that no request for these videotapes, which Plaintiff contends were in the District's possession, was ever made to the Roosevelt Defendants. The Plaintiff did, however, serve Scott with a subpoena dated September 7, 2011, after the close of discovery.[12] *Id.* ¶ 9 & Ex. A. The subpoena requested all video recordings from June 2008 through July 2011. *Id.* Based on his practice of recording-over the prior meeting, Scott confirms for the Court that he is not in possession of any of recordings requested in the subpoena. *Id.* ¶ 10. Scott explicitly states that he never provided his video recordings to the District and that he never told anyone in the office of Plaintiff's counsel that he did so. *Id.* ¶¶ 7, 12. Apparently, in light of Scott's Affidavit, the Court notes that Plaintiff did not seek to further argue this element of his spoliation motion in his Reply Brief. In any event, the Court finds no basis to award sanctions against the Roosevelt Defendants based on the alleged spoliation of videotape recordings over which the Roosevelt Defendants never had control.

### 3.    *Documents*

Lastly, Dr. Curcio seeks spoliation sanctions against the Roosevelt Defendants based on various documents which were never produced. The Roosevelt Defendants argue that all documents that had been requested have been produced to the Plaintiff. Plaintiff counters that the Roosevelt Defendants either failed to produce certain documents or did not produce documents in a timely manner, both warranting sanctions. However, the Court has already concluded that any production made by the Roosevelt Defendants, notwithstanding the admittedly late manner of such production, does not warrant sanctions here.

---

[12]    It appears this subpoena was not served on counsel for the Roosevelt Defendants, in violation of Rule 45 of the Federal Rules of Civil Procedure.

The first pieces of documentary evidence identified by Plaintiff as being untimely

produced and/or missing are performance evaluations and a resume for Assistant Superintendent

for Curriculum and Instruction Roxanne Garcia France.  These particular documents were not

requested until Plaintiff's counsel sent a letter dated August 28, 2011, to Defendants' counsel, five

days before the discovery cut-off date.[13]  *See* Savoiardo Decl., Ex. A.  In any event, the Roosevelt

Defendants have established that they produced the 2008-2009 evaluation and resume of Garcia-

France as part of their October 19, 2011 Response to Plaintiff's Second Set of Document

Requests.  *Id.*, Ex. B.  These documents were bates-stamped 1950-1954 and 1976-1978.  *Id.*  As

for Garcia-France's 2009-2010 evaluation, that document was produced by the Roosevelt

Defendants on January 27, 2012.  *Id.*  Superintendent Harris has confirmed in his affidavit that no

evaluation was ever created for Garcia-France for the 2010-2011 year.  Harris Aff. ¶ 6.  In

response, the Plaintiff continued to take issue only with the 2009-2010 evaluation.[14]

The Plaintiff states that the 2009-2010 evaluation produced on January 27, 2012 was

unsigned.  Plaintiff takes the position that Harris testified it was his normal custom and practice to

have himself and the individual being evaluated sign the evaluation and place a copy in the

---

[13]    The Court notes that Plaintiff did request the employment file of Garcia-France in his first request for production of documents on July 14, 2012.  *See* Savoiardo Decl., Ex. A.

[14]    Plaintiff, in passing, also claims that the last page of the Garcia-France resume is still missing and has not been provided.  Reply Mem. at 11.  However, there does not appear to be a fourth page to Garcia-France's resume.  On the first page of Garcia-France's three-page resume, there is a notation that this page is page 1 of 3.  *See* Savoiardo Decl., Ex. B.  The last page of the resume ends with a notation that References are available upon request.  With no evidence to the contrary, the Court finds no basis to conclude that Garcia-France's resume is more than three pages in length.

individual's personnel file.  Accordingly, Plaintiff argues that "[t]here is no proof that this was the actual evaluation that Superintendent Harris had created for Ms. Garcia-France and that it had not been altered or created specifically to respond to this motion."  *See* Pl.'s Reply Mem. at 8.  While Harris did testify that it was his general practice to sign employee evaluations, such testimony offers little support from an evidentiary standpoint whether a signed original exists of Garcia-France's 2009-2010 evaluation.  While Garcia-France was also deposed in this action, Plaintiff provides no supporting evidence from her sworn testimony regarding these evaluations.  According to Harris' "general practice," Garcia-France would also have received a copy.  *See* Louis D. Stober, Jr. Decl. in Further Supp. of Pl.'s Mot. for Sanctions ("Stober Decl. II"), Ex. C ("Harris Dep.") at 78.  With only supposition based on a general practice to infer that the 2009-2010 evaluation was ever signed, Plaintiff's unsupported accusations of evidence tampering are troubling.  The fact that the personnel files were removed from the Human Resources Department in February 2011 does not constitute evidence that the Roosevelt Defendants withheld the real documents while creating and producing fictitious ones.  While the Roosevelt Defendants have not explained why the 2009-2010 evaluation, dated June 30, 2010, was only produced on January 27, 2012, that unanswered question, standing alone, is not an adequate basis to impose sanctions under the circumstances previously discussed. Therefore, Plaintiff's motion for sanctions based on the Roosevelt Defendants' failure to produce a signed copy of Garcia-France's 2009-2010 evaluation, a non-existent 2010-2011 evaluation of Garcia-France and a phantom fourth page to her Resume, must fail.

Dr. Curcio next takes issue with documents Superintendent Harris purportedly submitted to the New York State Education Department ("NYSED") regarding Funderburke's candidacy for and appointment to the Board of Education. These documents were requested by the Plaintiff on August 28, 2011. *See* Savoiardo Decl., Ex. A. Initially, the Plaintiff claims that Harris contacted the NYSED as early as November 2008 on these issues. However, Plaintiff maintains that since the Roosevelt Defendants failed to preserve and produce such documents, Plaintiff cannot ascertain what was stated and how many times the NYSED was contacted. Without a scintilla of evidence presented to suggest that Harris contacted the NYSED in or around November 2008, the Court finds this argument to be nothing more than speculation.

According to the Plaintiff, after an incident involving Funderburke on April 23, 2009, Harris reported this incident to the NYSED. There is no evidence, however, to suggest that there are any documents memorializing any contact Harris had with the NYSED other than a November 12, 2009 e-mail, a copy of which is in Plaintiff's possession. *See* Savoiardo Decl., Ex. C. In fact, the April 24, 2009 e-mail Plaintiff identifies for the Court between Johanna Poitier, a NYSED employee, and Dr. Curcio only states that she "spoke" with Harris. *See* Louis D. Stober Decl. in Supp. of Mot. ("Stober Decl."), Ex. B. Further supporting the conclusion that no other documents were sent to the NYSED is Harris' Affirmation in which he states that the only documents he provided to the NYSED were Dr. Curcio's EEOC Charge and the e-mails which were attached to it. *See* Harris Aff. ¶ 7. Consequently, Plaintiff's motion for spoliation sanctions based upon the Roosevelt Defendants' failure to produce documents purportedly sent to the NYSED is unavailing.

c. *Original copy of Dr. Curcio's 2010-2011 Evaluation*

Similar to one of the arguments Plaintiff advanced regarding Garcia-France's evaluations, Dr. Curcio contends that a signed copy of his 2010-2011 evaluation was never produced. However, Plaintiff's position presupposes that such a signed copy exists. During his deposition, Harris testified that there "should be" a signed copy of Curcio's 2010-2011 evaluation. *See* Stober Decl., Ex. A at 283. When pressed by Plaintiff's counsel whether he had "a mental image in your mind of seeing a document with yours and Dr. Curcio's signature on it for the 2010-2011 evaluation," Harris stated that "I will not commit to that right now." *Id.* The testimony immediately following, which was not included in Plaintiff's submission, sheds light on why a signed copy would not exist. Harris testified that at the time of the meeting to discuss the 2010-2011 evaluation, he believed Dr. Curcio got up and left the meeting without signing the evaluation once he found out he would not be recommended for tenure. *See* Savoiardo Decl., Ex. K ("Harris Dep.") at 284. The Court notes that Dr. Curcio himself has not submitted any sworn statement attesting to the fact that he signed the 2010-2011 evaluation. In contrast, Superintendent Harris has filed an affidavit stating that Dr. Curcio never signed the evaluation. Harris Aff. ¶ 8. Without any elementary proof that a signed 2010-2011 evaluation ever existed, the Court finds no basis for awarding sanctions.

d. *District Legal Bills*

Dr. Curcio also seeks sanctions for spoliation based upon the Roosevelt Defendants' failure to produce the District's legal bills from the Guercio & Guercio ("G&G") law firm covering the time period 2008 through the present. According to the Plaintiff, Harris testified at his deposition that he used these bills to evaluate and decide whether Plaintiff would receive

tenure for the 2010-2011 academic year.  In response, the Roosevelt Defendants argue that they produced those G&G bills which Harris reviewed in preparing Dr. Curcio's 2010-2011 evaluation.  The Court has been provided with an e-mail that was sent to Plaintiff's counsel on September 13, 2011 which included G&G billing records for the period December 1, 2010 through February 28, 2011.  *See* Savoiardo Decl., Ex. D.  These documents were bates-stamped 1925-1945.  *Id.*  Harris further confirmed that the only G&G bills he relied on were those contained in the production made on September 13, 2011.  *See* Harris Aff. ¶ 5.

Notwithstanding this production – and the fact that Plaintiff's argument for spoliation sanctions based on missing legal bills was premised solely on G&G bills from 2008 to the present – Dr. Curcio argues for the first time in his Reply that the produced bills did not cover all the legal bills Harris reviewed.  Dr. Curcio claims that while Harris testified that he compared G&G legal bills with those of the District's former counsel, Jaspan Schlesinger, only the G&G bills were provided.  While Harris' deposition testimony offers some support for the argument that Harris did consider Jaspan Schlesinger bills, *see* Harris Dep. at 279-281, the Court declines to address the merits of any argument raised for the first time in Plaintiff's Reply Brief.  *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (citing cases which declined to consider an argument raised for the first time in a reply brief).  However, the Court reiterates that if Plaintiff's counsel believed that the responses provided by the Roosevelt Defendants were not adequate, Dr. Curcio had the ability to seek court intervention, something counsel opted not to do.  Based on the evidence submitted by the Roosevelt Defendants, the Court finds no basis to award spoliation sanctions on the claim that G&G's legal bills were not produced.

According to the Plaintiff, the Roosevelt Defendants also failed to disclose Harris' 2008 written evaluation of Dr. Zakierski. This evaluation was requested by the Plaintiff on August 28, 2011. *See* Savoiardo Decl., Ex. A. Harris avers that no written evaluation was prepared for Dr. Zakierski during the 2007-2008 school year. Harris Aff. ¶ 3. Dr. Curcio, however, maintains that this statement conflicts with Harris' deposition testimony. The Court does not agree. During his deposition, Superintendent Harris stated that he *believed but was not certain* that a written evaluation of Dr. Zakierski was performed prior to not recommending that she receive tenure. *See* Stober Decl. II, Ex C at 42-43. Plaintiff argues that the Roosevelt Defendants *could have* destroyed the documents when they removed the personnel files from the HR Department. Again, this is a serious accusation, borne of speculation, without any evidence that such a document ever existed. It begs the question where is the good faith foundation for such a precarious allegation? Had Plaintiff submitted a statement from Dr. Zakierski (or someone else with knowledge) that such an evaluation had been created, the landscape of Plaintiff's argument would be different. However, no such evidence was submitted. Plaintiff's recurring position of relying on testimony that a document "could" exist and then seeking sanctions based on the fact that the document was not produced is neither persuasive nor productive. As such, the Court can assign no weight to such an unsupported allegation.

Harris does explain that he informed Dr. Zakierski that she would not receive tenure during a phone conversation on April 9, 20[08].[15]  Harris Aff. ¶ 4.  On April 10, 2008, the day after the phone conversation, Harris prepared a letter setting forth the reasons why tenure for Dr. Zakierski was being denied.  *Id.*  That April 10, 2008, letter was produced to the Plaintiff on January 27, 2012 and is bates-stamped 2095-2096.  Savoiardo Decl., Ex. E.  Although the Court is not condoning the January 27, 2012 delayed production of this letter, it has already been established that any "late" production does not serve as a basis for spoliation sanctions here.  Therefore, the Court declines to impose any sanction related to Harris' evaluations of Dr. Zakierski.

### f.     Harris' Contract of Employment

Another proposed basis for spoliation sanctions is Plaintiff's contention that Harris' contract for employment with the District and his 2010 and 2011 renewal contracts were never produced.  These documents were requested by the Plaintiff in late August 2011 – the week discovery was to close.  *See* Savoiardo Decl., Ex. A.  In any event, the Roosevelt Defendants have established that they produced Harris' employment contracts in their October 19, 2011 Responses to Plaintiff's Second Set of Document Requests.  Savoiardo Decl., Ex. F.  These documents were bates-stamped 1955-1975.  *Id.*  In light of the fact that Plaintiff is in possession of these contracts, and apparently has been since October 2011, the Court denies the motion to award sanctions for spoliation based on these documents.

---

[15]     Harris' Affidavit states that the phone conversation occurred on April 9, 2011.  Based on all the submitted materials, it is clear to the Court that the year 2011 was a typographical error.

Dr. Curcio also seeks spoliation sanctions for the Roosevelt Defendants' alleged failure to produce the original envelope and "contents" from Superintendent Harris' April 15, 2011 letter denying Dr. Curcio tenure.  The Court notes that there is no dispute over the April 15, 2011 denial of tenure letter itself, which Plaintiff's counsel presented as an exhibit during Harris' deposition. Savoiardo Decl., Ex. K at 71.  It is the original envelope in which that letter was mailed and the "contents" of that envelope which are at issue.  At his deposition, Harris confirmed that the April 15 denial of tenure letter was sent to the Plaintiff both by certified mail, return receipt requested, and by hand delivery.  *Id.* at 72.  While Harris confirmed that the mailing was returned to him, he also confirmed that he personally hand delivered the letter to Dr. Curcio.  *Id.*

With regard to the alleged "content" of the mailing, it appears to be Dr. Curcio's position that his 2010-2011 evaluation could have been attached to the April 15, 2011 letter that was mailed, but never received, by him.  This argument is based on nothing more than conjecture.  Dr. Curcio offers no evidence to support the position that the evaluation was attached to the April 15 letter or that the documents which were hand-delivered to him were not the same as those that were mailed.  Moreover, there was no testimony during Harris' deposition that the 2010-2011 evaluation was attached to the April 15, 2011 letter.  Rather, Harris testified that the body of the April 15 letter makes reference to copies of relevant sections from the Education Law being annexed to the letter.  *Id.* at 75.

45

As to the original envelope, there is no real doubt that it was returned to the District. When asked whether he retained the original envelope, Harris testified that he *may* have it. *Id.* at 73. However, it subsequently came to light that the envelope was not saved. Since the envelope was not preserved, Plaintiff's argument is grounded in the more traditional spoliation context of failure to preserve evidence. However, the Court concludes that the Roosevelt Defendants were under no duty to preserve the original envelope since it essentially has no relevance to the claims or defenses raised in this action. *See Zubulake IV*, 220 F.R.D. at 218 (finding that duty to preserve extends only to documents or tangible things that are considered relevant under Rule 26 of the Federal Rules of Civil Procedure). Therefore, Plaintiff has not sustained a claim for sanctions relating to the mailed April 15, 2011 letter.

> h.  *Draft Professional Development Plan*

According to Dr. Curcio, the Roosevelt Defendants have not produced a copy of the draft Professional Development Plan ("PDP") that was allegedly given to him by Harris. In response, the Roosevelt Defendants maintain that the Plaintiff admitted at his deposition and in his Rule 56.1 Statement that he was provided with this document. The Court confirms that Plaintiff's Rule 56.1 Counter-Statement shows that the Plaintiff does not dispute that Harris provided him with a sample PDP during his second year of employment. This admission, however, does not clarify whether either party has a copy of this draft PDP today. To the extent the draft PDP existed at the time the duty for the Roosevelt Defendants to preserve documents attached, a colorable argument may exist that this obligation was breached. While Plaintiff proffers arguments in his Reply Brief for spoliation sanctions regarding many of the documents already discussed, Plaintiff does not address the draft PDP. Having failed to meet his burden to show that the Roosevelt Defendants

breached their duty to preserve the draft PDP with the requisite culpable state of mind or that the draft PDP was relevant, Dr. Curcio's request for spoliation sanctions regarding this particular piece of evidence is denied.

### i. Documents Showing Number of Grievances

Dr. Curcio also alleges that the Roosevelt Defendants failed to produce documents showing the large number of grievances which purportedly existed at the time he was hired. Again, this request was only made to the Roosevelt Defendants on August 28, 2011, the week discovery was closed. Savoiardo Decl., Ex. A. Putting aside the issues surrounding the timing of the request, the Roosevelt Defendants objected to this request as being vague and overbroad in their Response to Plaintiff's Second Set of Document Requests. *See* Savoiardo Decl., Ex. B. At no point after receiving this response did Plaintiff's counsel seek Court intervention by way of a motion to compel. Dr. Curcio maintains that the request was not broad and that these documents are relevant to his claims. However, these contentions properly belong in a motion to compel, not a spoliation motion. Having failed to show that the Roosevelt Defendants had an obligation to produce documents showing the number of grievances at the time Plaintiff was hired, the Court declines to award any spoliation sanctions in this category as well.

### j. Board Meeting Minutes and Amended Agendas

Finally, Dr. Curcio seeks spoliation sanctions based on the Roosevelt Defendant's failure to produce Board meeting minutes and amended agendas. Notwithstanding the fact that the Plaintiff did not specify in his opening papers what particular minutes or agendas had not been

produced, the Roosevelt Defendants counter that they disclosed all Board meeting minutes from July 2008 through August 2011 and meeting agendas from July 2008 through July 2011.

Dr. Curcio requested Board Meeting Minutes from January 2004 to the present in his First Set of Document Requests served on July 14, 2011. Savoiardo Decl., Ex. A. Objecting to Plaintiff's request on multiple grounds, the Roosevelt Defendants nevertheless produced on August 9, 2011, those Board Minutes referenced in the Complaint. Savoiardo Decl., Ex. G. These documents were bates-stamped 397-594. The Roosevelt Defendants then supplemented their responses on August 30, 2011 and produced additional minutes covering over three years of Board meetings spanning January 2008 through June 2011. These documents were bates-stamped 666-1545 and 1548-1824. In addition, the Roosevelt Defendants produced the minutes covering Board meetings held in July and August 2011 as part of their January 27, 2012, production. *Id.*, Ex. H. According to the Roosevelt Defendants, these minutes were not transcribed at the time of their August production. Concerning the Board meeting agendas, the Court notes that Plaintiff's document requests served on July 14 did not contain a request for meeting agendas. It was not until Plaintiff's August 31, 2012 "deficiency letter" that a reference to "Agenda minutes" was made. *Id.*, Ex. A. Thereafter, the Roosevelt Defendants disclosed all Board agendas as part of their January 27, 2012 production. *Id.*, Ex. I. The Board agendas are bates-stamped 2097-3112

Despite receiving over 2,000 pages of Board meeting minutes and agendas spanning over three years, the Plaintiff claims in his Reply brief that the Roosevelt Defendants selectively produced those documents and have failed to produce "HR Supplemental Agendas and Minutes from April 23, 2009, May 14, 2009, May 28, 2009, June 30, 2009, July 7, 2009, and February 4,

2010." Pl.'s Reply Mem. at 12. The Plaintiff subsequently decreases the number of purportedly missing supplemental agendas and minutes to only four: (1) May 14, 2009; (2) May 28, 2009; (3) June 30, 2009; and (4) February 4, 2010.[16] *Id.* at 13. After spending considerable time reviewing the productions made by the Roosevelt Defendants, the Court was able to locate agendas for the four meetings in question. It appears that these agendas were served as part of the Roosevelt Defendants' supplemental responses dated August 30, 2011 and were again included in the January 27, 2012 production.[17] *See* Savoiardo Decl., Exs. G, I. However, the various productions do not include the minutes or "supplemental agendas" from these four Board meetings.

Because the Plaintiff raised issues surrounding materials from these four particular Board meetings only in his Reply Brief, the Court does not have the benefit of a response from the Roosevelt Defendants regarding these materials. As was the case with many of the other documents on which Plaintiff bases his motion for sanctions, the Roosevelt Defendants did not get the opportunity to provide the reasons why the documents were not produced. Without the benefit of any input from the Roosevelt Defendants, the Court has conducted its own research from the mass of documents submitted in conjunction with the instant motion. Notably, with regard to the referenced June 30, 2009 Board meeting, no Board minutes were produced because the Board meeting did not go forward on June 30. Rather, as the agenda produced for June 30, 2009 clearly indicates, the meeting was held instead on July 7, 2009. *See* Savoiardo Decl., Ex. G.

---

[16] The Court has confirmed that the minutes from the April 23, 2009 and July 7, 2009 Board meetings were included as part of the August 9, 2011 production. These documents were bates-stamped 421-436 and 549-567.

[17] For example, the May 14, 2009 agenda begins at bates-stamp 712 and 2380, the May 28, 2009 agenda is bates-stamp 720 and 2388, the June 30, 2009 agenda begins at bates-stamp 736 and 2404 and the February 4, 2010 agenda begins at bates-stamp 2469.

Moreover, after reviewing the submitted record, the instant motion appears to be the first reference to "Supplemental Agendas."  The documents provided reveal that the Plaintiff never used the term "Supplemental Agendas" in any of his document requests. Therefore, the Court has no way of knowing whether these documents even exist.

In any event, merely identifying that certain documents were not produced does not entitle a party to spoliation sanctions.  Plaintiff fails to make a sufficient showing to satisfy his burden of establishing that the Roosevelt Defendants destroyed these documents with the requisite culpable state of mind.  In addition, counsel's arguments as to why these supplemental agendas and minutes are "important and relevant," without the support of any extrinsic evidence, falls far short of the necessary showing.  *See Zubulake V*, 229 F.R.D. at 431; *Orbit One Comm'ns, Inc.*, 271 F.R.D. at 439.  Therefore, Plaintiff's motion must fail as it relates to missing Board minutes or supplemental agendas.

## V.    CONCLUSION

As noted earlier in this decision, Plaintiff never filed a motion to compel, which was not only his right under the Federal Rules of Civil Procedure, but which was the appropriate means of seeking relief for the purported non-production of relevant information.  Instead, Plaintiff bypassed that step in the process – a step built into the discovery procedures precisely to have the Court's assistance in addressing deficiencies in responses or disputes between parties that need resolution so the parties can complete discovery in a timely manner.  Hurdling over that step to an immediate sanctions motion on a claim of spoliation renders the Rules superfluous.

For the reasons set forth above, Dr. Curcio is entitled to monetary sanctions against Defendant Funderburke equal to the costs incurred in making the motion for spoliation sanctions, including reasonable attorneys' fees. Plaintiff's counsel shall file with the Court a letter indicating the costs and attorneys' fees incurred in making the motion against Funderburke with supporting contemporaneous billing records which substantiate the amount requested. Counsel for Defendant Funderburke will have fourteen (14) days from the filing to submit any opposition to the amount sought. With regard to the Roosevelt Defendants, Dr. Curcio's motion is denied in its entirety.

**SO ORDERED.**

Dated: Central Islip, New York
        August 10, 2012

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge