UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN J. CURCIO,

                        Plaintiff,

            -against-

ROOSEVELT UNION FREE SCHOOL DISTRICT,
BOARD OF EDUCATION OF THE ROOSEVELT
UNION FREE SCHOOL DISTRICT, and
WILHELMINA FUNDERBURKE, individually and
as a member of the BOARD OF EDUCATION OF
THE ROOSEVELT UNION FREE SCHOOL DISTRICT,

                        Defendants.
-------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
10-CV-5612 (SJF)(AKT)

**F I L E D**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y
★ AUG 2 2 2012 ★

**LONG ISLAND OFFICE**

FEUERSTEIN, United States District Judge:

On December 3, 2010, plaintiff John J. Curcio ("plaintiff") commenced this action

against defendants Roosevelt Union Free School District (the "District"), the Board of Education

of the Roosevelt Union Free School District (the "Board") (and together, "the Roosevelt

Defendants"), and Wilhelmina Funderburke, individually and as a member of the Board of

Education of the Roosevelt Union Free School District ("Funderburke"), alleging violations of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), violations of

42 U.S.C. §§ 1983, 1985, and 1986, violations of New York Executive Law § 296, and

intentional and negligent infliction of emotional distress. [Docket Entry No. 1]. On July 15,

2011, plaintiff filed an amended complaint, and defendant Funderburke moved to dismiss. The

motion to dismiss was denied on November 10, 2011.

1

Before the Court are motions for summary judgment filed by: (1) the Roosevelt Defendants [Docket Entry No. 61]; and (2) defendant Funderburke [Docket Entry No. 63]. For the reasons that follow, the Roosevelt Defendants' motion is GRANTED IN PART and DENIED IN PART. Funderburke's motion is GRANTED.

I.     Factual Background

     A.     Plaintiff's Position and Salary

Plaintiff is a Caucasian male. Plaintiff's Statement Pursuant to Local Civil Rule 56.1 [Docket Entry No. 62-66] ("Pl. 56.1 Stat.") at ¶ 2. On or about July 7, 2008, he was hired as the District's Assistant Superintendent for Human Resources and Professional Development, at a salary of $142,000.00 per year. Id. at ¶¶ 1, 5.[1] Plaintiff was employed in this capacity on a three (3)-year probationary basis. Id. at ¶ 20; Affidavit of John Curcio [Docket Entry No. 62-67] ("Curcio Aff.") at ¶ 2. Plaintiff understood that at the conclusion of this probationary period, the District would have one (1) of three (3) options: (1) offer him a tenured position; (2) offer him an additional year of employment on probationary status; or (3) terminate his employment. Roosevelt Defendants' Statement Pursuant to Local Civil Rule 56.1 [Docket Entry No. 61-44] ("Roos. Def. 56.1 Stat.") at ¶ 21.

Plaintiff was one (1) of several assistant superintendents employed by the District. See Roos. Def. 56.1 Stat. at ¶¶ 8-9. After commencing his employment, plaintiff learned that Assistant Superintendent for Curriculum and Instruction Roxanne Garcia-France ("Garcia-

_____

[1] This was an increase over plaintiff's salary with his former employer. Pl. 56.1 Stat. at ¶ 6.

France"), a black female of Caribbean national origin, was earning a base salary of $168,000.00. Pl. 56.1 Stat. at ¶ 14, 22-23.[2] This salary difference was not prohibited by the collective bargaining agreement. Roos. Def. 56.1 Stat. at ¶ 8. Plaintiff believes that this difference in salary was motivated by racial discrimination. See Curcio Aff. at ¶ 4.[3]

Plaintiff first raised his concerns about his rate of pay with District Superintendent Robert-Wayne Harris ("Superintendent Harris" or "Harris") in an e-mail dated July 17, 2008, shortly after he was hired. Roos. Def. 56.1 Stat. at ¶ 15; Roos. Def. Ex. N [Docket Entry No. 61-17]. At that time, plaintiff did not raise his alleged concern that the pay discrepancy was racially motivated because he did not want to "sour [his] relationship with the District and [plaintiff's] peers." Pl. 56.1 Stat. at ¶ 16; Curcio Aff. at ¶ 6. On at least three (3) different occasions during May and June 2009, Superintendent Harris, who is African-American, requested that the Board increase plaintiff's salary to $168,000.00. Pl. 56.1 Stat. at ¶¶ 29, 30, 35. The Board addressed the issue at its meetings on May 14, 2009, May 28, 2009, and June 30, 2009, but ultimately declined to approve the increase. Id.

During the 2009-2010 school year, the Board "equalized" the salaries of all but one (1) of the assistant superintendents at $142,000.00. Id. at ¶ 26. At that time, Garcia-France resigned

---

[2] Although unclear from his 56.1 statement, plaintiff appears to allege that Garcia-France received various stipends, allowances, and other payments in addition to her regular salary. Id. at ¶ 23. However, it appears that Garcia-France received these additional payments *before* being hired as Assistant Superintendent for Curriculum and Instruction, when she was employed with the District in various other positions. See Pl. Ex. SS.

[3] It is undisputed that plaintiff did not negotiate the terms of his salary when he was hired. Pl. 56.1 Stat. at ¶¶ 3-5. Garcia-France, on the other hand, researched the prevailing rate of pay for comparable positions and negotiated the terms of her salary during the hiring process. Roos. Def. 56.1 Stat. at ¶¶ 24-25.

from her position as Assistant Superintendent for Curriculum and Instruction and was rehired as Assistant Superintendent for Educational Services at an annual pay rate of $142,000.00. Id. at ¶ 32. The District then hired Dr. Marianne Steele ("Steele"), an African-American female, as Assistant Superintendent for Curriculum and Instruction, also at a salary of $142,000.00 per year. Plaintiff contends that he "had far more experience and qualifications" than Steele, and that he therefore was "entitled" to a higher salary than she. Id. at ¶¶ 33-34; Curcio Aff. at ¶ 15.

The one (1) assistant superintendent whose salary was not set at the $142,000.00 level was David Weiser ("Weiser"), a Caucasian male. Pl. 56.1 Stat. at ¶¶ 26-28. Weiser was hired as Assistant Superintendent for Business in 2009 at a salary of $150,000.00. Id. at ¶ 28. During the 2010-2011 school year, the District hired Gene Levenstien ("Levenstien"), a Caucasian male, as Assistant Superintendent for Business at a salary of $168,000.00 per year. Id. at ¶¶ 37-38.[4] Thus, in plaintiff's second and third years of employment, he was earning the same salary as Garcia-France and Steele, but less than Weiser or Levenstien. Id. at ¶ 36.

B.      Alleged Discriminatory Comments and Actions by Defendant Funderburke

At the time plaintiff was hired, defendant Wilhelmina Funderburke ("Funderburke"), an African-American female, was an active member of the Roosevelt community. Roos. Def. 56.1 Stat. at ¶¶ 49-51; Pl. 56.1 Stat. at ¶¶ 49-51. She often attended the Roosevelt Board of Education meetings as a member of the community; according to plaintiff, she also did so as a "de facto member of the Board and Board representative." Pl. 56.1 Stat. at ¶ 52. Despite the fact that she

---

[4] Plaintiff believes that Levenstien's salary was set after the District became aware of plaintiff's discrimination allegations, and was deliberately set at a higher level in order to defend against any such allegations by plaintiff. Curcio Aff. at ¶ 13.

was not a Board member, plaintiff claims that Funderburke exercised "considerable influence over the Board." Id.

During a September 24, 2008 Board meeting, Funderburke allegedly stated in plaintiff's presence that she was "not in favor of hiring another white Assistant Superintendent." Id. at ¶ 57. Although Funderburke made this comment from the general audience, plaintiff alleges that she "had a domineering role over the meeting" and "was exercising considerable control over the temperament of the Board and the community." Id. at ¶ 58; Curcio Aff. at ¶ 21. According to plaintiff, Board member Robert Summerville then expressed agreement with Funderburke's remarks. Pl. 56.1 Stat. at ¶¶ 54-55.

According to plaintiff, Funderburke "made unannounced visits" to the administration building where he worked, and would occasionally subject him to "threatening, harassing and severely discriminatory behavior." Id. at ¶ 56. Plaintiff alleges that on September 26, 2008, he encountered Funderburke in the hallway of his office building, and that she "became annoyed" when he did not immediately recognize her, stating: "You should remember me and what I said at the Board meeting." Id. at ¶¶ 60-61. Plaintiff further alleges that Funderburke appeared at his office on October 16, 2008 and told him "in sum and substance . . . that she was not in favor of his hiring because he was white." Id. at ¶ 62. Funderburke allegedly added that plaintiff's predecessor, who was also Caucasian, "was not what they were looking for" and "that it was telling that [plaintiff's predecessor] was no longer employed at the District." Id.; Pl. Ex. A at 167:3-20. Plaintiff informed Superintendent Harris of these incidents in an e-mail dated October 16, 2008. Id.; Ex. JJ.

On or about November 18, 2008, Funderburke was formally appointed as a member of

the Board of Education.[5] Id. at ¶ 53. According to plaintiff, during an executive session of the Board on Thursday, April 23, 2009, Funderburke accused him of "not treating various community members and employees of the District respectfully." Id. at ¶ 65. Funderbruke then allegedly told plaintiff that she was "never in favor of hiring him," that "he could not empathize with the students in the District because he was white," and "that he would have to have walked in their shoes to understand them." Id. at ¶ 66; Pl. Ex. LL. Plaintiff states that he was so upset by these comments that he walked out of the session. Def. 56.1 Stat. at ¶ 66. Gale Stevens-Haynes ("Stevens-Haynes"), then the Chairwoman of the Board, testified that the "treatment" of plaintiff around this time "crystallized" her decision to resign from the Board. Pl. 56.1 Stat. at ¶ 66; Pl. Ex. H [Docket Entry No. 62-8] at 27:11-14 ("I could not accept the treatment of Dr. Curcio as a member of that board and I no longer wanted to be part of that board.").

Plaintiff once again summarized these events and his concerns in e-mails to Superintendent Harris. In a reply e-mail dated April 28, 2009, Harris expressed continuing support for plaintiff and praised his performance. Pl. Exs. HH [Docket Entry No. 62-34]. Superintendent Harris reported Funderburke's remarks to the State Education Department. Pl. 56.1 Stat. at ¶ 67. On April 30, 2009, allegedly at the behest of the Senior Deputy Commissioner of Education, Johanna Duncan Portier, Funderburke apologized to plaintiff in front of the Board. Plaintiff dismisses the apology as "reluctant," "forced," and "hollow," and claims that it did "little" to ameliorate the humiliation that he felt. Id. at ¶ 70.

On or about July 11, 2009, plaintiff filed a charge of discrimination with the United

---

[5] At the time that plaintiff was hired, the District was being overseen by the New York State Department of Education, which under the State Department of Education's five (5) year plan, had the power to appoint individuals to the Board. Id. at ¶¶ 44-45.

States Equal Employment Opportunity Commission ("EEOC"), in which he alleged discrimination on the basis of his race and color. Roosevelt Def. Ex. A [Docket Entry No. 61-2]. The complaint recounted the incidents involving Funderburke between September 2008 and April 2009, and alleged that his salary was lower than that of non-Caucasian assistant superintendents. Id. This was the first time he "formally alleged" his purported belief that his lower salary was racially motivated. Pl. 56.1 Stat. at ¶ 17.

According to plaintiff, several more racially-charged incidents followed. At the September 10, 2009 executive session, Funderburke allegedly expressed "dissatisfaction over the fact that when one passes by the business or human resources office, one sees more white faces than African American faces." Id. at ¶¶ 73-74; Pl. Ex. AAA [Docket Entry No. 62-53]. Funderburke further stated that "the people in the [business and human resources offices] should look like the community." Id. On November 12, 2009, Funderburke stated that "while she was waiting for [a] meeting she would go around to each office and count the number of white faces in each office." Am. Compl. at ¶ 22. According to Assistant Superintendent Weiser's testimony, Funderburke appeared in his office and counted the number of Caucasian employees. Def. 56.1 Stat. at ¶ 86; Pl. Ex. F [Docket Entry No. 62-6] at 34:5-21.

During the December 3, 2009 executive session, the Board addressed the issue of pay raises for confidential secretaries employed by the District. Superintendent Harris recommended that all three (3) of the District's confidential secretaries receive a pay raise, including his own secretary, Diane Battle ("Battle"), an African-American female. Pl. 56.1 Stat. at ¶¶ 76-79. The other two (2) confidential secretaries employed by the District were Caucasian. Id. at ¶ 81. Plaintiff alleges that, at the meeting, the Board focused on Battle's pay raise, but not those for the

other secretaries.[6]  Id. at ¶ 80.  According to plaintiff, he asked: "[H]ow would it look if the Board acts to grant a salary increase to an African-American secretary while denying increases for two Caucasian secretaries?"  Id. at ¶ 84.  Funderburke allegedly responded: "[I]t would look great."  Id. at ¶ 85.  Funderburke then "queried as to why there were no individuals of her own appearance in the Human Resources Office."  Id. at ¶ 85; Pl. Ex. A at 188:3-197:25.  Plaintiff once again walked out of the meeting.  Id.  The next day, plaintiff wrote an e-mail to Superintendent Harris in which he stated that he believed the District was taking a passive approach to Funderburke's racial comments.  Pl. 56.1 Stat. at ¶ 71; Pl. Ex. OO [Docket Entry No. 62-41].

On January 5, 2010, Funderburke allegedly "entered [plaintiff's] office space unannounced and demanded to know the race of the people in [his] operation, what they looked like and the color of their skin."  Curcio Aff. at ¶ 35.  Plaintiff also alleges that on January 7, 2010, Funderburke's daughter, an African-American female and District employee, had a verbal dispute with the Human Resources Office's senior personnel clerk, Wendy Sawits, a Caucasian female.  Pl. 56.1 Stat. at ¶¶ 96-99.  According to plaintiff, the two argued over the manner in which another African-American employee, Clifton Brown ("Brown"), was being "processed" by the Human Resources Office.  Id. at ¶ 99.  Plaintiff claims that the dispute "contained a racial element."  Id. at ¶ 100.[7]

---

[6] Battle was a long-time employee of the District, while the other two (2) confidential secretaries had been hired only recently.  Pl. 56.1 Stat. at ¶¶ 78, 81.

[7] Plaintiff claims that he sought to have Brown suspended in accordance with District policy because Brown had neither been fingerprinted nor subjected to a background investigation.  Id. at ¶ 102.  Plaintiff further claims that Harris declined to suspend Brown and "disregarded" plaintiff's opinion because of his race.  Id.

C.    Plaintiff's Job Performance

During plaintiff's first year of employment, Superintendent Harris praised his job performance. In an e-mail dated April 28, 2009, Harris called plaintiff's achievements in the first nine (9) months "monumental." Pl. Ex. HH. Plaintiff's June 2009 performance evaluation was also overwhelmingly positive. Pl. Ex. GGG [Docket Entry No. 62-59]. In it, Superintendent Harris stated that plaintiff had "had a significant and extremely beneficial impact on the day-to-day management of the Human Resources Office," that his management was "strong," "superior," and "effective," that he demonstrated a "strong work ethic," dedicating "long hours and rigorous energy" to his position, that he gave "prompt attention to significant matters," and that he "always maintain[ed] a level of professionalism on a daily basis." Id.

Superintendent Harris' feedback during plaintiff's second year took a dimmer view of plaintiff's job performance. In a May 11, 2010 memorandum to plaintiff, Superintendent Harris requested a status report regarding a number of tasks and assignments, noting that he wanted to speak to plaintiff directly regarding the matters, as well as "other concerns." Roosevelt Def. Ex. S. In plaintiff's performance evaluation dated June 30, 2010, which was apparently delivered on November 16, 2010, Harris expressed concerns about plaintiff's professional demeanor and attendance at District-related events. Pl. Ex. HHH. The evaluation also included a list of objectives for the remainder of the school year, including Harris' expectation that plaintiff would implement a District professional development plan. Id.

Plaintiff's April 2011 evaluation was significantly less positive, with Superintendent Harris expressing a wide variety of concerns regarding plaintiff's job performance. Pl. Ex. Q [Docket Entry No. 62-17]. Harris noted that plaintiff was overly dependent upon outside counsel

9

for advice, that plaintiff had erroneously informed dozens of District employees that their positions had been "abolished," and that plaintiff had failed to follow instructions. Id. Harris also stated that plaintiff had failed to identify and correct errors on meeting agendas and again noted that plaintiff's communications were sometimes perceived by others as "intentionally demeaning or abrasive." The evaluation also noted that plaintiff had failed to implement the District professional development plan during the 2010-2011 school year. Id.[8]

D.    Denial of Tenure

On April 15, 2011, at the end of plaintiff's third year, Superintendent Harris recommended that plaintiff be denied tenure. Pl. Ex. TT [Docket Entry No. 62-46]. On May 5, 2011, before the Board had an opportunity to vote on Harris' recommendation, plaintiff resigned his position. Roos. Def. Ex. I [Docket Entry No. 61-11] at 319:14-20. He states that he resigned in order to "avoid the stigma of having a termination and denial of tenure on [his] record." Curcio Aff. at ¶ 67. Plaintiff argues that he was constructively discharged because of his race and as retaliation for filing an EEOC complaint, not because of poor job performance. Id. at ¶ 48.

E.    The Instant Action

On December 21, 2009, plaintiff's attorneys filed a petition in state court seeking to

---

[8] Plaintiff's papers include a lengthy explanation of why Harris' criticism of his failure to implement the professional development plan was insincere or exaggerated. He also states in his affidavit that he felt on "many occasions" that District employees and administrators "were not being cooperative" in providing him with the material he needed to design the professional development plan. Curcio Aff. at ¶ 18.

commence a special proceeding to file an untimely notice of claim against the Roosevelt Defendants. Pl. Ex. III [Docket Entry No. 62-61]; Defendant Funderburke's Statement Pursuant to Local Civil Rule 56.1 [Docket Entry No. 64] at ¶ 24. The petition did not refer to Funderburke by name, but attached plaintiff's EEOC complaint as an exhibit. See Pl. Ex. III.

By order dated February 4, 2010, Justice Edward W. McCarty III granted the petition as unopposed, stating: "Petition for an order pursuant to General Municipal Law 50-e(5) permitting petitioner to file a notice of claim, nunc pro tunc, is granted, without opposition." Pl. Ex. LLL [Docket Entry No. 62-64]. On or about April 6, 2011, an attorney from plaintiff's law firm sent copies of the petition, the EEOC complaint, and Justice McCarty's order to the District's counsel. Pl. Ex. BBB [Docket Entry No. 62-54].

The instant action was commenced on December 3, 2010, during plaintiff's third year of employment. The amended complaint asserts the following claims: (1) constructive discharge, denial of tenure, wage discrimination, and hostile work environment in violation of Title VII and 42 U.S.C. § 1983; (2) conspiracy to deprive plaintiff of his civil rights in violation of 42 U.S.C. § 1985; (3) failure to prevent a Section 1985 conspiracy in violation of 42 U.S.C. § 1986; (4) violations of New York Executive Law § 296 ("New York Human Rights Law"); and (5) intentional and negligent infliction of emotional distress.[9]

---

[9] All counts are asserted against the Roosevelt Defendants. Only the final two (2) counts are asserted against Funderburke in her individual and professional capacities.

II.    Discussion

A.    Summary Judgment Standard

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted).

"A fact is material when it might affect the outcome of the suit under governing law." Id. An issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried. . . . If the nonmoving party does not so respond, summary judgment will be entered against him."

Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . or upon the mere allegations or denials of the [nonmoving] party's pleading." Id. (internal quotation marks and citations omitted).

"Summary judgment is sparingly used where intent and state of mind are at issue . . . because, as [the Second Circuit has] emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted). "The trial court's function at this stage is to identify issues to be tried, not decide them." Id.

B.    Analysis

1.    Discriminatory Termination

Claims of discriminatory termination pursuant to Title VII are analyzed under the familiar McDonnell-Douglas burden-shifting framework.[10] See, e.g., Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008); Ebanks v. Neiman Marcus Group, Inc., 414 F.Supp.2d 320, 325 (S.D.N.Y. 2006). Under McDonnell-Douglas, plaintiff must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Ebanks, 414 F.Supp.2d at 325. The plaintiff's burden of proof at the prima facie stage "is

---

[10] "In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims." Annis v. Cnty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).

13

not onerous." Mathirampuzha, 548 F.3d at 78 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. Ruiz v. County of Rockland, 609 F.3d 486, 492 (2d Cir. 2010). If the defendant articulates a nondiscriminatory reason for the action, the burden shifts back to plaintiff to prove that the reason was a pretext for discrimination. Id. "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." Silver v. North Shore Univ. Hosp., 490 F.Supp.2d 354, 362 (S.D.N.Y. 2007).

Plaintiff has clearly established the first and third elements of his prima facie case. He has shown that he is a member of a "protected class," see Stepheny v. Brooklyn Hebrew School for Special Children, 356 F.Supp.2d 248, 259 n. 9 (E.D.N.Y. 2005) ("[T]he Supreme Court has held that Title VII prohibits racial discrimination against whites on the same terms as racial discrimination against non-whites.") (citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)), and he has shown that he suffered adverse employment actions: the denial of tenure and termination of his probationary employment, see Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011).

The remaining two (2) elements are hotly disputed. The Court need not address the second element (i.e., whether plaintiff was performing his duties satisfactorily), however, because plaintiff has failed to show that he was denied tenure under circumstances giving rise to an inference of racial discrimination. Initially, plaintiff does not dispute that Superintendent Harris ultimately exercised sole discretion in determining whether to recommend him for tenure.

14

<u>See</u> Affidavit of Robert-Wayne Harris [Docket Entry No. 61-45] ("Harris Aff.") at ¶¶ 5, 20, 21.

There is nothing in the record to indicate that Harris himself harbored any discriminatory animus

toward plaintiff; on the contrary, Harris expressed strong disapproval of Funderburke's

derogatory remarks on several occasions. <u>See</u> Pl. Ex. JJ (October 16, 2008: referring to

Funderburke as a "racist"); Pl. Ex. II (April 23, 2009: calling the remarks "ignorant and foolish,"

noting that "[e]verybody is in your corner supporting you"); Pl. Ex. HH (April 28, 2009: noting

that he was "offended and insulted" by Funderburke's comments); Pl. Ex. KK (November 12,

2009: stating that he "do[es] not support such behavior"). Even if Harris was not sufficiently

forceful or proactive in responding to Funderburke's comments, <u>see</u> Plaintiff's Memorandum of

Law in Opposition [Docket Entry No. 62-65] ("Pl. Opp. Br.") at 25, this is not enough to create a

reasonable inference that his tenure recommendation was based upon plaintiff's race.

Plaintiff insinuates that Superintendent Harris was unduly influenced by Funderburke and

her views, stressing that they met on a weekly basis, Pl. Ex. C [Docket Entry No. 62-3] at 6:19-

7:17, and that Harris had an incentive to please the Board because it was responsible for

renewing his contract. Pl. Opp. Br. at 36. In other words, plaintiff argues that Harris bowed to

racially-motivated pressure from Funderburke and the Board to deny plaintiff tenure. This

theory, however, is founded upon nothing more than plaintiff's own speculation, as there is

nothing to indicate that Funderburke or any other Board member influenced Harris' decision.

<u>See, e.g.</u>, <u>Patterson v. Cnty. of Oneida, N.Y.</u>, 375 F.3d 206, 223 (2d Cir. 2004) (plaintiff failed to

make out <u>prima facie</u> case when evidence only related to discrimination by co-workers, not actual

decisionmakers); <u>Quinby v. WestLB AG</u>, No. 04 Civ. 7406, 2007 WL 3047111, *1 (S.D.N.Y.

Oct. 18, 2007) ("Generally speaking, comments by non-decision makers cannot be used to

establish discriminatory animus."). Indeed, Funderburke testified that she never "g[a]ve any input" to Harris as to whether plaintiff should have been granted tenure, Roosevelt Def. Ex. K [Docket Entry No. 61-14] at 159:5-159:14, and plaintiff has not provided any evidence to the contrary. See generally Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (court must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture").

Moreover, the ultimate tenure decision lay with the Board, not Harris. See Pl. Ex. TT. Theoretically, the Board could have declined to follow Harris' recommendation and voted to grant plaintiff tenure. However, plaintiff resigned before the Board had an opportunity to hold a vote on the issue, Roosevelt Def. Ex. I at 319:14-20,[11] and even if there was evidence that the Board was poised to adopt Harris' recommendation, plaintiff has not presented any evidence that the Board as a whole was motivated by racial animus. Although plaintiff believes that Funderburke was a dominating figure, she was ultimately only one (1) member with one (1) vote. See Barbano v. Madison Cnty., 922 F.2d 139, 142 (2d Cir. 1990) ("[D]iscrimination by one individual does not necessarily imply that a collective decision-making body of which the individual is a member also discriminated.").

Finally, plaintiff does not dispute that both his predecessor *and* his successor were Caucasian. Both of these individuals were hired after being recommended by Superintendent Harris and being approved by the Board. Harris Aff. at ¶ 20. Although this fact alone does not preclude plaintiff from establishing a prima facie case of discrimination, see Brown v.

---

[11] Although Funderburke testified that the Board had voted against granting tenure, Roosevelt Def. Ex. K at 157:16-22, the parties appear to agree that this is inaccurate. Roos. Def. 56.1 Stat. at ¶ 154.

Henderson, 257 F.3d 246, 253 (2d Cir. 2001) (citing Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir. 1996), it does further undermine his claim. See Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005) ("a replacement within the same protected class cuts strongly against any inference of discrimination"); see also Fleming v. MaxMara USA, Inc., 644 F.Supp.2d 247, 262 (E.D.N.Y. 2009) (granting summary judgment when plaintiff had failed to produce evidence of discrimination and when plaintiff's replacement was "same race and gender"); Montanile v. Natl. Broadcast Co., 211 F.Supp.2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination.").[12]

For the foregoing reasons, the Roosevelt Defendants are entitled to summary judgment on this claim.

    2.    Disparate Pay Claim

"Where a plaintiff is attempting to establish a prima facie case of disparate pay under Title VII 'a plaintiff must show: (1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus.'" Kearney v. ABN AMRO, Inc., 738 F.Supp.2d 419, 426 (S.D.N.Y. 2010) (quoting Thomas v. iStar Financial, Inc., 438 F.Supp.2d 348, 367 (S.D.N.Y. 2006)).

---

[12] Plaintiff's analogy to Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) is flawed. In Reeves, there was evidence that the "actual decisionmaker" who fired plaintiff made explicitly discriminatory comments, including calling plaintiff "too damn old to do [his] job." There was also evidence that the decisionmaker had a track record of treating plaintiff less respectfully than his much younger colleague, even though the two were equally productive. Reeves, 530 U.S. at 151. In contrast, there is no evidence of racial bias or unequal treatment by Harris, or anyone else who made the actual tenure decision.

Plaintiff has failed to establish a prima facie case of disparate pay under Title VII for

several reasons. First, plaintiff has not demonstrated that he was paid less than similarly situated

African-American employees. "[W]here a plaintiff seeks to make out [his] prima facie case by

pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must

show that she shared sufficient employment characteristics with that comparator so that they could

be considered similarly situated." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001)

(citation omitted). "In other words, where a plaintiff seeks to establish the minimal prima facie

case by making reference to the disparate treatment of other employees, those employees must

have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the

difference of treatment may be attributable to discrimination." Id. at 54. "While it is true that the

responsibilities and duties of similarly situated employees need not be identical, they must be

similar in all material respects." Kearney, 738 F.Supp.2d at 428.

Plaintiff points to the isolated example of Roxanne Garcia-France, an African-American

assistant superintendent who was for one (1) year paid more than he was, even though she was

purportedly less qualified. Pl. Opp. at 11-12. Although Garcia-France was paid $168,000.00

during the 2008-2009 school year, she was ultimately reassigned to a different area, at which point

her salary was reduced to $142,000.00. Roos. Def. Ex. I at 140:17-141:9.[13] Plaintiff has not

demonstrated that he "shared sufficient employment characteristics with [Garcia-France] so that

they could be considered similarly situated." Although both held the title of "assistant

---

[13] Plaintiff also argues that he received a lower salary than a newly-appointed African-American middle school principal and a newly-appointed African-American Assistant Superintendent for Educational Services. Curcio Aff. at ¶ 4. Plaintiff fails to include any information about these individuals to demonstrate that they were "similarly situated" to him.

superintendent," they were assigned to and responsible for overseeing different subject areas. See Thomas, 438 F.Supp.2d at 368 (employees sharing same title not similarly situated when they have different duties and responsibilities). Furthermore, Garcia-France had more seniority with the District by the time she was appointed, Pl. 56.1 Stat. at ¶ 40, and also, unlike plaintiff, she negotiated her salary when she was hired.

In addition, for two (2) of the three (3) years that plaintiff was employed by the District, the highest paid assistant superintendents in the District were Caucasian. Roos. Def. Ex. I at 143:11-147:4.[14] During that time, the two (2) African-American assistant superintendents were paid the same salary as plaintiff (i.e., $142,000.00 per year). Id. at 140:24-141:24. Furthermore, Funderburke was not a member of the Board at the time plaintiff was hired, and there is no evidence that she played any role in determining his compensation. Although plaintiff was subsequently denied salary increases by the Board while Funderburke was a member, he has failed to establish any kind of link between Funderburke's comments and the Board's decision. The evidence presented simply does not support an inference of pay discrimination.

Plaintiff relies upon McGuinness v. Lincoln Hall, 263 F.3d 49 (2d Cir. 2001). In that case, however, a pattern of disparate treatment was apparent: two (2) Caucasian employees were offered severance packages that were lower than those of their two (2) similarly situated African-American colleagues. See id. at 56. No such pattern exists in this case, where for the majority of the time, plaintiff was paid less than his Caucasian colleagues, and the same as his African-American colleagues. As plaintiff has presented no evidence from which a reasonable jury can

---

[14] At the time Weiser was hired, in 2009, he was the highest paid assistant superintendent in the District. Roos. Def. Ex. I at 143:11-144:13. When Levenstien was hired the next year, he then became the highest paid assistant superintendent.

conclude that his salary level was discriminatory, summary judgment is granted with respect to this claim.

### 3. Hostile Work Environment

"Title VII is violated '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race]." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks and citations omitted). "[T]o survive summary judgment, a plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Bind v. City of New York, 08 Civ. 11105, 2011 WL 4542897, at *13 (S.D.N.Y. Sept. 30, 2011) (citing Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996)).

"To establish a hostile atmosphere, however, plaintiff[] must prove more than a few isolated incidents of racial enmity." Snell v. Suffolk Cnty., 782 F.2d 1094, 1103 (2d Cir. 1986); see also Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness."). A plaintiff alleging a series of incidents

20

must demonstrate that they were "'sufficiently continuous and concerted' to have altered the conditions of her working environment." Alfano, 294 F.3d at 374 (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)).

Defendants emphasize the relative infrequency of Funderburke's racial comments, amounting to six (6) remarks over the course of three (3) years. Roos. Def. Br. at 5. However, "[t]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (quoting Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 439 (2d Cir. 1999)). Rather, "[t]he Supreme Court has held that a work environment's hostility should be assessed based on the 'totality of the circumstances.'" Patane, 508 F.3d at 113 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

The parties dispute whether the first three (3) of Funderburke's comments can even be imputed to the Roosevelt Defendants, since she made them before she was officially appointed to the Board. Although the Second Circuit has not yet addressed the question of whether an employer may be held liable on a hostile work environment theory for the actions of a non-employee, see General v. Center for Disability Rights, No. 11-cv-1489, 2012 WL 1992266, at *2 (2d Cir. June 5, 2012), some courts have found that such actions may be imputed to the employer if it failed to take steps "reasonably calculated to end the harassment." McDonald v. B.E. Windows Corp., No. 01 Civ. 6707, 2003 WL 21012045, at *4 (S.D.N.Y. May 5, 2003) (citing cases).

However, even assuming that there is a basis for imputing all six (6) comments to the

Board and District defendants, the hostile work environment claim still fails as a matter of law.

> For racist comments, slurs, and jokes to constitute a hostile work environment . . .
> there must be a steady barrage of opprobrious racial comments. Although there is
> no threshold magic number of harassing incidents that give rise to a hostile work
> environment claim, as a general rule, incidents must be more than episodic; they
> must be sufficiently continuous and concerted in order to be deemed pervasive.

Arroyo v. New York Downtown Hosp., No. 07 CV 4275, 2010 WL 3861071, at *6 (E.D.N.Y.

Sept. 28, 2010) (internal quotation marks and citations omitted). The comments and conduct

alleged in this case are insufficient to meet that standard. Although the alleged statements may

have been crude and racially insensitive, they were not sufficiently "severe" or "pervasive" to alter

the conditions of plaintiff's working environment. See Bickerstaff v. Vassar Coll., 196 F.3d 435,

452 (2d Cir. 1999) ("Title VII is not a 'general civility code.'"). For the most part, plaintiff's

colleagues and superiors disavowed Funderburke's views. Indeed, plaintiff's direct supervisor,

Harris, dismissed the comments and explicitly reaffirmed his support for plaintiff.

Therefore, the comments at issue are properly classified as isolated and sporadic, occurring three (3)

times during September and October 2008, once in April 2009, once in September 2009, and then

once again in December 2009. Comments made at such irregular intervals, over such a long

period of time, particularly by an individual who did not exercise any direct supervisory authority

over plaintiff, cannot serve as the basis of a hostile work environment claim. Thus, summary

judgment with respect to this claim is also granted. See, e.g., Stepheny, 356 F.Supp.2d at 264 (co-

worker's use of racial epithet five (5) times over five (5) months insufficient to establish hostile

work environment claim); McPherson v. NYP Holdings, Inc., No. 03-CV-4517, 2005 WL

2129172, at *7-8 (E.D.N.Y. Sept. 1, 2005) ("Three comments made over a period of more than

two years amount only to a few isolated incidents, and therefore do not constitute a hostile work

environment."); <u>Pagan v. New York State Div. of Parole</u>, No. 98 Civ. 5840, 2003 WL 22723013, at *5 (S.D.N.Y. Nov. 18, 2003) (four (4) derogatory racial comments by plaintiff's supervisor did not amount to "extremely serious" behavior necessary for hostile work environment claim); <u>Dorrilus v. St. Rose's Home</u>, 234 F.Supp.2d 326, 335 (S.D.N.Y. 2002) (grating summary judgment when supervisor made four (4) references to African-American plaintiff as "El Negro" and commented that "he hate[d] black people"); <u>Stembridge v. City of New York</u>, 88 F.Supp.2d 276, 286 (S.D.N.Y. 2000) ("Overall, seven instances over three years does not create a work environment permeated with racial hostility.").

### 4. Title VII Retaliation

"Title VII contains an antiretaliation provision, which makes it unlawful for an employer to discriminate against an employee for opposing any practice made unlawful by Title VII." <u>Tepperwien v. Entergy Nuclear Operations, Inc.</u>, 663 F.3d 556, 567 (2d Cir. 2011). "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management." <u>La Grande v. De Crescente Dist. Co., Inc.</u>, 370 Fed. Appx. 206, 212 (2d Cir. 2010). "It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" <u>Id.</u> (quoting <u>Treglia v. Town of Manilus</u>, 313 F.3d 713, 719 (2d Cir. 2002)).

"Retaliation claims under Title VII are generally analyzed under a modified version of the <u>McDonnell Douglas</u> test. First, the plaintiff must establish a prima facie case of retaliation by

showing: (1) his participation in protected activity; (2) defendant's knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Tepperwien, 663 F.3d at 568 n. 6. "Second, if the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action." Id. "Third, if the employer does so, then the burden shifts back to the plaintiff to prove that retaliation was a substantial reason for the adverse action." Id. (citations omitted).

Plaintiff has raised triable issues of fact regarding his Title VII retaliation claim. There does not appear to be any dispute that plaintiff has established the first three (3) elements of his prima facie case. First, plaintiff engaged in a series of protected activities during his time at Roosevelt, including making a number of complaints to Harris. See Sclafani v. PC Richard & Son, 668 F.Supp.2d 423, 427 (E.D.N.Y. 2009) ("[I]nformal complaints to supervisors constitute protected activity under Title VII."). Plaintiff specifically identifies his filing of the EEOC charge, which is clearly a protected activity under Title VII, as the impetus for the alleged retaliation.[15] Gaines v. N.Y. City Transit Auth., 353 Fed. Appx. 509, 511 (2d Cir. 2009) (noting that filing of EEOC charge is protected activity). Second, the parties do not dispute that Harris and the Roosevelt Defendants had knowledge of the action.

Third, the Roosevelt Defendants also took materially adverse employment actions against plaintiff. While the most notable of these was Harris' recommendation against tenure, see Nagle, 663 F.3d at 105, the negative performance evaluations are also adverse actions because they are

_____

[15] Plaintiff does not appear to claim that any defendant retaliated against him in response to filing the instant action.

24

linked to the termination of plaintiff's employment and could have dissuaded a reasonable worker from making a charge of discrimination. See Kercado-Clymer v. City of Amsterdam, 370 Fed. Appx. 238, 243 (2d Cir. 2010); Casalino v. New York State Catholic Health Plan, Inc., No. 09 Civ. 2583, 2012 WL 1079943, at *13 (S.D.N.Y. Mar. 30, 2012) (where poor review was alleged to be "precursor" to termination, events could be considered "related" adverse employment actions); Krinsky v. Abrams, No. 01 CV 5052, 2007 WL 1541369, at *11 (E.D.N.Y. May 25, 2007) (negative performance evaluation might dissuade reasonable worker from making or supporting charge of discrimination); Hernandez v. Kellwood Co., No. 99 Civ. 10015, 2003 WL 22309326, at *17 (S.D.N.Y. Oct. 8, 2003) (negative performance reviews are adverse actions as long as "there is evidence linking the evaluations and criticism to an attendant tangible loss, such as termination . . . .").[16]

The parties do dispute whether there is a causal connection between the protected activity and subsequent adverse actions. "A plaintiff may establish a Title VII retaliation even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for a discharge." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (internal citation omitted). However, a retaliatory motive must be at least a "substantial" or "motivating" factor behind the adverse action. Id. Plaintiff may establish such a causal link either "directly, through evidence of retaliatory animus" or "indirectly, by showing that the protected

---

[16] Plaintiff contends that the adverse actions also included "being subjected to increased scrutiny" and "being placed in a position of constant attack." Pl. Opp. at 35. Neither of these rises to the level of an adverse employment action, see generally Bennett v. Watson Wyatt & Co., 136 F.Supp.2d 236, 248 (S.D.N.Y. 2001) (threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions), although they may be relevant to the "causal connection" analysis.

activity was followed closely by discriminatory treatment, or through other circumstantial evidence . . . ." Id. (quoting Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). "Under some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination." Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)).

Plaintiff argues that he was denied tenure partially as retaliation for his EEOC complaint, characterizing his steadily declining performance evaluations as the "paper trail" Harris needed to justify his decision. Pl. Opp. Br. at 36. The Roosevelt Defendants respond that the retaliation claim must be dismissed as a matter of law because there is a lack of temporal proximity between service of plaintiff's complaint and Superintendent Harris' recommendation against tenure. Roosevelt Def. Br. at 17.

"[T]emporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a prima facie retaliation claim." Kim v. Columbia Univ., 460 Fed. Appx. 23, 25 (2d Cir. 2012). "[T]his period is measured from the date of the 'employer's knowledge of [the] protected activity.'" Id. (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). The Second Circuit has "not identified an outer limit beyond which a temporal relationship is too attenuated to support a finding of causality." Id. Rather, a court must "exercise [its] judgment about the permissible inferences that can be drawn from the temporal proximity in the context of particular cases." Id. (quoting Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)); see also Neal v. JPMorgan Chase Bank, N.A., No. 10-1157, 2012 WL 3249477, at *17 (E.D.N.Y. Aug. 8, 2012) ("[B]ecause the Second Circuit has

found period well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record."). When the facts of a particular case call for it, a flexible view of the "temporal proximity" analysis may be warranted. See Bernhardt v. Interbank of New York, 18 F.Supp.2d 218, 226 (E.D.N.Y. 1998), amended on other grounds by No. 92 CV 4550, 2009 WL 255992, at *6 (E.D.N.Y. Feb. 3, 2009) (denying summary judgment when eleven months passed between events); see also Bucalo v. Shelter Island Union Free School Dist., --- F.3d ----, 2012 WL 3240382, at *9 (2d Cir. Aug. 10, 2012) (noting that retaliation claim was submitted to jury notwithstanding four (4)-year gap of time because defendant took adverse action "on its first opportunity to do so").

Moreover, temporal proximity itself is not necessary to survive summary judgment. "While temporal proximity between protected activity and an adverse action can support an inference of unlawful retaliation, [it] is but one factor that must be considered with all others." Tuccio Development, Inc. v. Town of Brookfield, No. 08-cv-1016, 2010 WL 2794192, at *18 (D. Conn. July 14, 2010) (citing cases); see also Oliphant v. Connecticut Dept. of Transp., No. 3:02cv700, 2006 WL 3020890, at *10 (D. Conn. Oct. 23, 2006) ("The operative issue is not simply the length of time between the protected activity and the alleged retaliation but the demonstrated nexus between the two."); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000) (when "temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus"). According to some courts, a plaintiff may also demonstrate the causal connection by showing a "pattern of antagonism" over the intervening period. Chan v. NYU Downtown Hosp., No. 03 Civ. 3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004) (citing Kachmar v. SunGard Data

27

Sys., 109 F.3d 173, 177 (3d Cir. 1997)); see also Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (causal connection can be established with evidence that "protected activity was followed by discriminatory treatment").

Although the passage of time between service of plaintiff's EEOC complaint and his resignation is indeed significant, the inquiry does not end here. That passage of time must be viewed in the context of this particular case: plaintiff served his EEOC complaint soon after receiving his annual performance evaluation in 2009, and, by all appearances, he was not scheduled to receive another review until the end of the next school year. The fact that the more negative formal reviews did not start until the next regularly scheduled evaluation does not mean that the two events are too attenuated to be causally linked. The same is true with respect to Harris' recommendation against tenure, which did not occur until April 2011; the parties agree that plaintiff was hired for a three (3)-year probationary term and was not to be considered for tenure until the end of the 2010-2011 school year. See Roos. Def. 56.1 Stat. at ¶¶ 20-21; Pl. 56.1 Stat. at ¶¶ 20-21.

According to plaintiff's version of events, the Roosevelt Defendants began laying the foundation for his dismissal after he filed the EEOC complaint, with Harris becoming excessively critical of his work and making complaints that were inconsistent with prior comments. See Curcio Aff. at ¶ 39-55, 66. There is in fact evidence that the tone of Harris' formal and informal feedback changed between early 2009 and April 2011, taking a sharp turn for the worse during plaintiff's third year. Compare Pl. Ex. GGG [Docket Entry No. 62-59] (evaluation dated June 8, 2009) with Pl. Ex. HHH (evaluation dated June 30, 2010) and Pl. Ex. Q (evaluation dated April 15, 2011). In plaintiff's June 2009 performance evaluation, Superintendent Harris stated, among

other things, that plaintiff had "had a significant and extremely beneficial impact on the day-to-day management of the Human Resources Office," that his management was "strong," "superior," and "effective," that he demonstrated a "strong work ethic," dedicating "long hours and rigorous energy" to his position, that he gave "prompt attention to significant matters," and that he "always maintain[ed] a level of professionalism on a daily basis." Pl. Ex. GGG. Several weeks earlier, in an e-mail dated April 28, 2009, Harris commended plaintiff for making "monumental gains" notwithstanding "a severely limited staff," "years of inefficiencies in the Human Resources Office," and a job that was "almost next to impossible." Pl. Ex. HH. Plaintiff vigorously disputes the subsequent criticisms of his work, arguing that they were in some respects contradictory with previous comments, see Curcio Aff. at ¶ 65 (noting that Harris began to criticize plaintiff's lack of attendance at District functions, even though he "was attending the same number of District events" as before July 2009), and that some were overreactions to minor clerical errors, see id. at ¶¶ 54-55. He claims that he was singled out for this criticism and treated differently from his colleagues. Id. Weiser's testimony also lends support to plaintiff's claim that he fell out of favor with Harris during his second year of employment, although Weiser did not specifically link this to plaintiff's EEOC complaint. Pl. Ex. F at 68:14-69:24; see also Curcio Aff. at ¶ 118.

Reviewing the evidence in the light most favorable to plaintiff, the Court finds that there are triable issues of fact as to the presence of a "causal link" between the protected activity and subsequent adverse actions. Furthermore, although the Roosevelt Defendants have articulated a legitimate, non-discriminatory reason for its adverse employment action (*i.e.*, plaintiff's allegedly poor job performance), plaintiff has raised triable issues as to whether that explanation is pretextual.

In order to meet his burden of demonstrating pretext, "plaintiff may rely on evidence presented to establish his prima facie case, as well as additional evidence such as direct or circumstantial evidence of retaliation." Conklin v. Cnty. of Suffolk, --- F.Supp.2d ----, 2012 WL 1560390, at *14 (E.D.N.Y. May 3, 2012). Pretext might be shown by "[p]roof that the defendant's explanation is unworthy of credence," Reeves, 530 U.S. at 148, or proof of "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action," Casalino, 2012 WL 1079943, at *16. Although "[p]rior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual," Hines v. Hillside Children's Center, 73 F.Supp.2d 308, 315 (W.D.N.Y. 1999), the fact that "evaluations of the plaintiff post-dating the protected activity contradict earlier evaluations" may serve as evidence of pretext. Ibok v. Securities Indus., 369 Fed. Appx. 210, 213 (2d Cir. 2010) (citing Treglia v. Town of Manlius, 313 F.3d 713, 722 (2d Cir. 2002). Courts have noted that a sudden drop-off in performance evaluations can serve as evidence that would raise an inference of retaliation. See, e.g., Phillip v. City of New York, No. 09 Civ. 442, 2012 WL 1356604, at *14-17 (E.D.N.Y. Apr. 19, 2012); Behringer v. Lavelle School for Blind, No. 08 Civ. 4899, 2010 WL 5158644, at *15-16 (S.D.N.Y. Dec. 17, 2010) (complaint followed by negative performance review, followed by discharge one (1) year later sufficient to raise inference of retaliation); see also Lang v. Illinois Dept. of Children & Family Servs., 361 F.3d 416, 420 (7th Cir. 2004) (negative annual review after complaint could demonstrate poor performance or continuing pattern of retaliation, but "this is not an issue that can be resolved on a motion for summary judgment").

Plaintiff has also presented some evidence that, in this regard, he was treated differently

from his colleagues. See Pl. Ex. F at 68:14-69:24 (Wesier: Harris's "demeanor did change . . . .
He seemed to always have a concern with something John did . . . ."). Plaintiff further claims that
Harris imposed unrealistic demands and set him up for failure, particularly by requiring him to
implement a professional development plan by the end of his probationary term. See Curcio Aff.
at ¶ 42; 46. See Lang, 361 F.3d at 420 (evidence that employee was held to "unrealistic
standards" may assist in raising inference of causation). These are disputed issues that cannot be
resolved on summary judgment.

A reasonable jury could find that the escalating criticisms and negative performance
reviews, ultimately culminating in a denial of tenure, were motivated at least in part by retaliation
for plaintiff's discrimination complaint. Although the length of time that passed may weigh
against a verdict for plaintiff, the Court's role on summary judgment is not to weigh the evidence,
but to identify disputed issues of fact for trial. Accordingly, summary judgment as to the Title VII
retaliation claim is denied. See generally E.E.O.C. v. Avecia, Inc., 151 Fed. Appx. 162, 163-64
(3d Cir. 2005) (despite lengthy gap between complaint and termination, summary judgment
improper when plaintiff presented evidence of negative performance reviews and increased
scrutiny by management leading to termination).


### 5. First Amendment Retaliation

"A public employee's right to freedom of speech is not absolute." Berhheim v. Litt, 79
F.3d 318, 324 (2d Cir. 1996). "However, when a public employee speaks as a citizen on a matter
of public concern, that speech is entitled to First Amendment protection." Id. "The problem is to
balance the employee's free speech rights with the interests of the public employer." Cioffi v.

Averill Park Central School Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Pickering

v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). "A public employee

who makes a First Amendment claim of employment retaliation under § 1983 must show that: (1)

his speech addressed a matter of public concern, (2) he suffered an adverse employment decision,

and (3) a causal connection exists between his speech and that adverse employment decision, so

that it can be said that the plaintiff's speech was a motivating factor in the adverse employment

action." Id. (citing Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)).

Plaintiff is vague about what "speech" he claims to be at issue. From a careful review of

his opposition brief, he appears to argue that he suffered retaliation for all of the complaints he

made to Harris and the State Department of Education; his EEOC complaint; his protest that the

Board was focusing on a pay raise for African-American, but not Caucasian, secretaries; his

complaint that Funderburke had become directly involved in a personnel matter, and his

recommendation that certain African-American employees be terminated for failing to comply

with District requirements. See Pl. Opp. at 38-41.

"The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any

matter of political, social, or other concern to the community.'" Sousa v. Roque, 578 F.3d 164,

170 (2d Cir. 2009) (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d

708 (1983)). "[A] speaker's motive is not dispositive in determining whether his or her speech

addresses a matter of public concern." Id. at 173. However, this "does not negate the fact that . . .

'speech on a purely private matter, such as an employee's dissatisfaction with the conditions of

his employment, does not pertain to a matter of public concern.'" Id. at 174 (quoting Lewis v.

Cowen, 165 F.3d 154, 164 (2d Cir. 1999)).

With one (1) possible exception, the speech plaintiff has identified arose from his dissatisfaction with the conditions of his own employment, and did not pertain to a matter of public concern. Plaintiff argues that he was "trying to improve the school District" and "was speaking on behalf of those who were silenced and afraid to take a stand against the racially motivated actions of the Board." Pl. Opp. at 39-40. However, he identifies nothing to support this claim and fails to identify any of the individuals on whose behalf he was allegedly speaking. Plaintiff's complaints about Funderburke, many of which have been submitted to the Court, relate exclusively to his own employment grievances. See Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008) ("[A] public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run.").

Arguably, plaintiff's question to the Board, "[H]ow would it look if the Board acts to grant a salary increase to an African-American secretary while denying increases for two Caucasian secretaries?," related to a matter of public concern because it was related to discrimination against other employees and may be interpreted as an attempt to protect the District from liability. See Rosenberg v. City of New York, No. 09-cv-4016, 2011 WL 4592803, at *9 (E.D.N.Y. Sept. 30, 2011) ("A complaint about system-wide discrimination may constitute a matter of public concern."); see also Curcio Aff. at ¶ 33. Even so, plaintiff has not identified any causal connection between that statement itself and any subsequent adverse action. Summary judgment is therefore granted with respect to plaintiff's first amendment retaliation claim.


6.      Municipal Liability Under 42 U.S.C. § 1983

Next, plaintiff claims that the Roosevelt Defendants are liable under 42 U.S.C. § 1983

because Board members "failed to put an end to [Funderburke's] behavior." Pl. Opp. at 42.

"Section 1983 provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999). "Municipalities and other local government bodies, including school districts, are considered 'persons' within the meaning of § 1983." Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 128 (2d Cir. 2004) (citing cases); see also Kantrowitz v. Uniondale Union Free Sch. Dist., 822 F.Supp.2d 196, 217 (E.D.N.Y. 2011). However, the municipal body can "only be held liable if its 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Id. (quoting Monell v. Dept. of Soc. Servs., 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "It is well settled that a municipality may not be held liable where there is no underlying constitutional violation by a municipal official." Levy v. Alfano, 47 F.Supp.2d 488, 498 (S.D.N.Y. 1999).

The Roosevelt Defendants cannot be held liable under Section 1983 because plaintiff has not identified any underlying constitutional violation by a municipal official. It is clear that "verbal harassment, standing alone, does not amount to a constitutional deprivation . . . ." Cole v. Fischer, 379 Fed. Appx. 40, 43 (2d Cir. 2010); see also Haussman v. Fergus, 894 F. Supp. 142, 149 n. 20 (S.D.N.Y. 1995) ("Offensive racial comments cannot form the basis of a 1983 claim."). The Roosevelt Defendants' failure to "put an end" to Funderburke's comments is no basis for liability under Section 1983. Even if plaintiff had identified a constitutional violation, there is no evidence of a custom or policy sufficient to impose municipal liability under Monell v. Department of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly,

34

summary judgment with respect to this claim is also granted.

       7.     42 U.S.C. §§ 1985, 1986

"Section 1985(3) clearly provides a remedy for conspiracies to deprive persons of their rights under the United States Constitution." Pabon v. New York City Transit Auth., 703 F.Supp.2d 188, 202 (E.D.N.Y. 2010) (citing cases). In order to state a cause of action under the statute, plaintiff must allege: "(1) a conspiracy (2) for the purpose of depriving a person or class or persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." Id. (internal quotation marks and citation omitted).

Summary judgment as to this claim is granted because, for the reasons discussed above, plaintiff has failed to show any violation of a constitutional right. Nasca v. Cnty. of Suffolk, No. 05-CV-1717, 2008 WL 53247, at *8 n. 8 (E.D.N.Y. Jan. 2, 2008) ("Plaintiff's conspiracy claim under 42 U.S.C. § 1985 must also fail because there is no underlying Section 1983 violation."); O'Bradovich v. Vill. of Tuckahoe, 325 F.Supp.2d 413, 426 (S.D.N.Y. 2004); see also Sherlock v. Montefiore Medical Ctr., 84 F.3d 522, 527 (2d Cir. 1996) (The "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)."). Moreover, the allegations of a conspiracy between Harris and Funderburke are speculative and unsupported by evidence. At most, plaintiff alleges that the two met with each other on a regular basis, see Pl. Opp. at 44,

which is insufficient to raise any triable issues of fact.

Furthermore, "[a] claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985." Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994). Since plaintiff's Section 1985 claim does not survive summary judgment, the Section 1986 claim must be dismissed as well.

        8.     State Law Claims

        a.     Plaintiff's Notice of Claim

The remaining state law claims are asserted against all defendants. Funderburke moves to dismiss all claims against her, arguing that plaintiff failed to file a timely notice of claim. Funderburke Memorandum of Law in Support of Motion for Summary Judgment [Docket Entry No. 63-6] at 4-9.

In New York, "no action or proceeding may be prosecuted or maintained against any school district or board of education unless a notice of claim has been 'presented to the governing body' . . . ." Biggers v. Brookhaven-Comsewogue Union Free School District, 127 F.Supp.2d 452, 454 (S.D.N.Y. 2001) (quoting Parochial Bus Sys., Inc. v. Board of Educ., 60 N.Y.2d 539, 549, 458 N.E.2d 1241, 470 N.Y.S.2d 564 (1983)). A written verified claim must be presented to the governing body of the school district within three (3) months of accrual of such a claim. Bucalo v. East Hampton Union Free School District, 351 F.Supp.2d 33, 34-35 (E.D.N.Y. 2005) (citing N.Y. Educ. Law § 3813 (1)); see also Lamothe v. Town of Oyster Bay, No. 08-cv-2078, 2011 WL 4974804, at *10 (E.D.N.Y. Oct. 19, 2011) ("New York General Municipal Law § 50-e requires that a plaintiff must file a notice of claim prior to the commencement of an action against

36

a municipality, and must serve the notice of claim within ninety days after the claim arises."). This requirement also applies to actions against members of a school board. See N.Y. Educ. Law § 3813(1).

"[A] failure to present a claim within ninety days of its accrual is a fatal defect," Bucalo, 351 F.Supp.2d at 35, and "[t]he burden is on the plaintiff to plead and prove compliance with the notice of claim requirements . . . ." Lamothe, 2011 WL 4974804, at *11 (citing Russell v. County of Nassau, 696 F.Supp.2d 213, 245 (E.D.N.Y. 2010)). "[F]ederal courts . . . routinely grant summary judgment with respect to discrimination claims brought under New York state law on the basis of failure to file a notice of claim." Augustin v. Enlarged City School Dist. of Newburgh, 616 F.Supp.2d 422, 446 (S.D.N.Y. 2009).

A court may extend the time to file the notice of claim as long as the request is made within the one (1)-year statute of limitations for commencing an action against a school district or board of education. Jones v. City Sch. Dist. of New Rochelle, 695 F.Supp.2d 136, 147 (S.D.N.Y. 2010) (citing Amorosi v. S. Colonie Indep. Cent. Sch. Dist., 9 N.Y.3d 367, 849 N.Y.S.2d 485, 880 N.E.2d 6 (2007)). As discussed above, plaintiff did not serve a notice of claim within the ninety (90) day period, but moved for an extension of time to do so in state Supreme Court. Funderburke does not dispute that plaintiff filed the motion for extension of time within the one (1)-year statute of limitations, Funderburke Br. at 7, but claims that plaintiff did not actually serve the notice until July 2011, well after his time to do so expired, id. (citing Docket Entry No. 63-4). She also argues that no claims may be asserted against her in an individual capacity because the notice of claim fails to assert any claims against her individually. Id. at 8-9.

Plaintiff responds that his July 2009 EEOC complaint was timely and functioned as a

notice of claim, and that Justice McCarty's order permitted the EEOC complaint to serve as the notice of claim. Docket Entry No. 64-1 at 4-9. Although there may be cases in which an EEOC complaint may substitute for a notice of claim, this is not one of those cases. Not only did the EEOC complaint fail to put defendants on notice of the precise nature of the claims alleged, but it appears that the complaint was simply mailed to the Director of Human Resources, rather than being properly filed with the Board of Education. See Brtalik v. South Huntington Union Free School Dist., No. 10-cv-0010, 2010 WL 3958430, at *5 (E.D.N.Y. Oct. 6, 2010); Newman v. Leroy Cent. School Dist., No. 07-CV-2699, 2008 WL 974699, at *4 W.D.N.Y. Apr. 8, 2008). Moreover, contrary to plaintiff's argument, the state Supreme Court order only granted him leave to *file* a notice of claim, see Pl. Ex. LLL, which it appears he did not do in a timely manner.

Even setting the notice of claim issue aside, however, the state law claims fail on their merits.

### b. New York Executive Law § 296

Plaintiff alleges violations of New York Executive Law § 296 (the "New York State Human Rights Law") by both Funderburke and the Roosevelt Defendants.

Executive Law § 296 states, in pertinent part:

> It shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of an individual's . . . race, . . . color, [or] national origin . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

The "usual practice of this Circuit" is to "treat . . . Title VII and New York State Human Rights Law claims 'as analytically identical, applying the same standard of proof to both claims.'"

Desir v. Bd. of Co-op. Educ. Servs., 803 F.Supp.2d 168, 183 (E.D.N.Y. 2011). Insofar as this claim is asserted against the Roosevelt Defendants, summary judgment is granted for the reasons discussed supra.

Plaintiff appears to argue that Funderburke violated this statute by creating a hostile work environment. See Docket Entry No. 64-1 at 10-21. Although an individual may be held liable under Section 296 for aiding and abetting an employer's violation of the statute, see N.Y. Exec. Law § 296(6), "the case law is clear that in order for an individual to be found liable as an aider and abettor under [Section 296(6)], liability must first be established as to the employer." M.O.C.H.A. Soc., Inc. v. City of Buffalo, --- F.Supp.2d ----, 2012 WL 1952171, at *29 (W.D.N.Y. May 30, 2012). As plaintiff has not raised any triable issues of fact with respect to his employer's liability under the hostile work environment claim, summary judgment is appropriate. Even if, as plaintiff urges, Funderburke were found to be plaintiff's "employer," summary judgment would be granted because plaintiff cannot show the existence of a hostile work environment.

c.  Intentional Infliction of Emotional Distress

Finally, plaintiff asserts claims of intentional and negligent infliction of emotional distress. Setting aside the issue of plaintiff's notice of claim, these causes of action also fail on their merits.

"Under New York law, a claim of intentional infliction of emotional distress requires: '(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'" Conboy v. AT & T Corp., 241 F.3d 242, 258 (2d

Cir. 2001) (quoting Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)). "[T]he standard for stating a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy.'" Id. (quoting Howell v. New York Post Co., 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993)). "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Id. (quoting Stuto, 164 F.3d at 827).

The allegations in this case do not meet this "rigorous" standard. "The New York Court of Appeals has rarely allowed a plaintiff to sustain a claim for intentional infliction of emotional distress in an employment discrimination case." Turley v. ISG Lackawanna, Inc., 803 F.Supp.2d 217, 255 (W.D.N.Y. 2011) (citing Ahmed v. Compass Group, No. 99 CIV. 10032, 2000 WL 1072299, at *10 (S.D.N.Y. Aug. 3, 2000)). Although plaintiff clearly alleges that Funderburke directed a number of racially insensitive comments at him, "the use of religious, ethnic or racial aspersions to denigrate a person . . . is not sufficiently egregious conduct to sustain [an intentional infliction of emotional distress claim]." Graham ex rel. Graham v. Guilderland Cent. School Dist., 256 A.D.2d 863, 864, 681 N.Y.S.2d 831, 832 (3d Dep't 1998). Indeed, courts have repeatedly dismissed intentional infliction of emotional distress claims arising solely from a defendant's use of racial insults. See, e.g., Lawson v. New York Billiards Corp., 331 F.Supp.2d 121, 133 (E.D.N.Y. 2004) (dismissing IIED claim in which plaintiff alleged racist remarks, threats, and a conspiracy to have him arrested); Daniels v. Alvarado, No. 03 CV 5832, 2004 WL 502561, at *6 (E.D.N.Y. Mar. 12, 2004) ("Racial slurs on their own do not constitute conduct so 'extreme and outrageous' in nature as to sustain a claim for intentional infliction of emotional distress."); compare Turley, 803 F.Supp.2d at 255 (IIED claim survived summary judgment when

40

alleged conduct involved not only racial insults, but also harassment and death threats).

As the conduct alleged in this case does not rise to the "extreme and outrageous" levels needed to sustain a claim, the intentional infliction of emotional distress claim is dismissed.


### d. Negligent Infliction of Emotional Distress

"Under New York law, a plaintiff may establish [a claim for negligent infliction of emotional distress] in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.'" Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996); see also Zaidi v. Amerada Hess Corp., 723 F.Supp.2d 506, 520 (E.D.N.Y. 2010). "A plaintiff may recover for a purely emotional injury under the 'bystander' theory when: (1) [he] is threatened with physical harm as a result of defendant's negligence; and (2) consequently [he] suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family." Mortise, 102 F.3d at 696. Plaintiff has not alleged any such facts.

As for the "direct duty theory," a plaintiff can establish a cause of action "if [he] suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." Id. "The duty in such cases must be specific to the plaintiff, and not to some amorphous, free-floating duty to society." Id. Not only has plaintiff failed to allege any danger to his physical safety, but he has failed to allege facts to suggest that defendants owed him a specific, unique duty. See id. Accordingly, this claim is also dismissed.


### III. Conclusion

The Court has reviewed the parties' submissions in their entirety. For the foregoing

reasons, the Roosevelt Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Funderburke's motion for summary judgment is GRANTED.

Jury selection and trial as to the liability of the Roosevelt Defendants on plaintiff's Title VII retaliation claim is adjourned to **Wednesday, September 19, 2012 at 10:00 a.m.**

**IT IS SO ORDERED.**

s/ Sandra J. Feuerstein
Sandra J. Feuerstein
United States District Judge

Dated:       August 22, 2012
            Central Islip, New York